**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| First American Title Insurance Company, | ) | Civil Action No.: 3:12-CV-00800-JFA |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Memorandum in Support of** |
| | ) | **Motion for Summary Judgment** |
| Columbia Harbison, LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

## I.   NATURE OF THE CASE AND MOTION

This is an insurance coverage action arising from an order issued by the South Carolina Court of Common Pleas stopping the insured's commercial development project on the grounds that the impact of the project violated a parking easement in favor of the adjoining landowner. At issue is approximately $4,500,000 in losses resulting from the state court order.

Pursuant to Fed.R.Civ.P. 56, Defendant, Columbia Harbison, LLC ("Columbia Harbison"), has moved for summary judgment on the second, third, fourth, fifth, and sixth causes of action in First American's amended declaratory judgment complaint. Having withdrawn its first and primary cause of action seeking judicial rescission of the affirmative endorsement at issue in the case, these additional counts by First American raise a series of contract defenses under various provisions of the title insurance policy. As will be demonstrated below, First American's interpretation of its policy is contrary to the express terms of the contract and well-established principles of insurance policy construction under South Carolina law.

In addition, Columbia Harbison's motion requests partial summary judgment on two issues from its breach of contract counterclaim: (1) First American's position as to the scope of resulting loss and damage covered by the applicable insuring clause in Columbia Harbison's

1

insurance policy; and (2) liability for attorneys' fees as an element of contract damages pursuant to *Hegler v. Gulf Ins. Co.,* 243 S.E.2d 443 (S.C. 1978).

When these issues are determined, the items that will remain for trial will be the dollar amount of loss and damage sustained by Columbia Harbison as a result of the state court order to remove the structures, the amount of attorneys' fees to be awarded for breach of contract, and liability and damages for Columbia Harbison's cause of action for bad faith. While the bad faith issues are not before the Court at this time, those issues include the assertion of pretextual defenses such as the now withdrawn fraud claim, the unreasonable failure to determine coverage in a timely manner in accordance with South Carolina law, and the failure to settle the underlying litigation against Columbia Harbison within the coverage provided by the policy.

## II. BACKGROUND

As this marks the first time this case has been before the Court for a decision on the merits, a recitation of the background of the dispute is helpful. Additional facts relevant to the specific arguments will be set forth in the body of the argument.

### A.    The Parties

Columbia Harbison, LLC is a single purpose entity formed to pursue a commercial real estate development project on Harbison Boulevard in the City of Columbia, South Carolina. First American Title Insurance Company issued title insurance coverage related to the property to be used in the development project, including two endorsements providing affirmative coverage for a specific easement affecting the development site.

### B.    The Project and the Parking Easement

The development project had two phases. The first phase involved construction of a McDonalds and a Bridgestone store fronting Harbison Boulevard. The second phase involved

construction of a four tenant building behind these properties that could also be accessed from Park Terrace Drive.  The four tenants were Staples, DSW, Ulta, and Homegoods.  One of these tenants, Staples, was relocating its business from its existing location on Park Terrace to the new building being developed by Columbia Harbison.

A portion of Columbia Harbison's real estate to be utilized in the second phase of development project was subject to a non-exclusive recorded easement for ingress, egress, and parking in favor of the adjoining landowner, B&L Harbison, which owned the location where Staples was currently operating.  Ex. 5, p. 3 ("Parking Easement").  The real estate development called for reconfiguring the parking in the easement area by creating a raised portion of the easement area through a combination of a retaining wall and a deck on pillars.  Reconfiguring the easement area in this manner allowed Columbia Harbison to build a larger and more desirable project than could otherwise be constructed.

### C.     The Title Insurance Policy and Endorsements

The real estate for the development project was obtained in stages.  The last parcel, which included the portion subject to the easement, was purchased March 30, 2011.  Amended Complaint ¶ 7.  At the time of the closing, First American issued an owner's policy of title insurance to Columbia Harbison.  *Id.* ¶ 8; Ex. 6.  In mid-August 2011, when it came time to proceed with the development, First American approved an affirmative endorsement specifically directed to the risk that the adjoining landowner may challenge the impact of the development project on the easement area.  Ex. 7.  That endorsement was finalized on August 30, 2011.  Ex. 8. The endorsement was re-issued by First American in September 2011 to reflect the final drawing date of September 1, 2011, for the plan attached the endorsement.  Ex. 9; Amended Complaint ¶¶

16-17.  There was no change in the text of the two endorsements apart from the change in the drawing date.  Amended Complaint ¶ 17.

Discussion for the endorsement dated back to October 2010 when the development plans were in the preliminary stages.  Amended Complaint ¶ 12.  From October 2010 until construction began in August 2011, the plans underwent a series of changes before arriving at the plan that was attached to the endorsement language approved in August 2011.  Relevant to this action, the endorsement as finally issued provides:

> the Company (i) insures against loss or damage resulting from an Order of Court of competent jurisdiction requiring the removal of all or a portion of the structures (including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas) designated as HomeGoods, Ulta, DSW and/or Staples (the "Structures") as shown on the site drawing dated 5-20-11, last revised 9-1-11 (the "Plans")

Ex. 9.  First American also agreed to defend any legal action seeking such an order based upon a violation of the Parking Easement.  *Id.*

## D.     The Lawsuit by B&L Harbison

Several weeks after construction began, the adjoining landowner brought suit on September 30, 2011, seeking actual damages, punitive damages, and an injunction based on allegations that the development project violated the easement. Ex. 10.  Columbia Harbison tendered the suit to First American, who accepted the defense of the lawsuit with no reservation of rights.  Ex. 1 (First Am. 30(b)(6) Dep.), p. 105, l. 4-8.  First American granted Columbia Harbison's request for the case to be defended by J. Calhoun Watson.  *See* Amended Complaint ¶ 27.  That same week, the adjoining landowner sought a temporary injunction to stop the construction project, which motion was heard in October 2011.  Based on its conclusion that the adjoining landowner had demonstrated a likelihood of success on the merits, the trial court issued a temporary injunction on November 1, 2011, effectively stopping the project from

4

proceeding after B&L Harbison posted the required bond.  *See* Ex. 11, p. 1, ¶ 2.  The case was set for trial to begin on March 26, 2012.  *Id.*, p. 2, ¶ 3.

## E.     First American confirmed coverage existed for at least some losses

The parties discussed coverage for Columbia Harbison's losses on multiple occasions. While the parties disagreed over the scope of coverage, First American does not dispute that its claims counsel, who has been in practice for 30 years, confirmed to Columbia Harbison that First American did have coverage for certain losses.  Ex. 1, p. 93, l. 22 – p. 94, l. 7; p. 106, l. 16-20.

On February 3, 2012, which was five months into the case and the week before mediation with the adjoining landowner, First American issued a general reservation of rights letter.  Ex. 12.  In that letter, First American did not identify any claims or losses that were not covered by the policy.  *Id.*  Instead, at its corporate deposition, First American testified that its reservation of rights letter was a "general reservation if something developed," and that the letter "definitely" should have been interpreted by the insured as confirming that First American had an indemnity obligation with respect to Columbia Harbison's claim.  Ex. 1, p. 107, l. 4 – p. 108, l.6.

## F.     First American's refusal to settle or determine coverage

The pre-trial mediation did not result in a settlement with the adjoining landowner.  In the wake of the mediation, Columbia Harbison provided First American with a written coverage analysis and a renewed request that First American settle the underlying litigation against Columbia Harbison.  Ex. 13.  In that analysis, Columbia Harbison stated "if for whatever reason First American decides against concluding a final resolution with B&L Harbison this week, it would be helpful if you could provide a written analysis of the policy language that supports the limited measure of damages that was espoused on Friday, especially as it relates to damages in the event of a permanent injunction."  *Id.*, p. 3.  First American did not respond.

Approximately two weeks later, with the viability of the development project in limbo, Columbia Harbison advanced multiple proposals, including a proposal to American that included authorizing Columbia Harbison to resolve the litigation using the future rent stream from the development, after which Columbia Harbison and First American could litigate coverage.  Ex. 14.  First American acknowledged the proposal and indicated an intent to respond, but ultimately failed to do so.  Ex. 15.  On March 1, 2012, Columbia Harbison set forth in detail its position that First American was acting in bad faith by litigating the case to no meaningful end without trying to settle with B&L Harbison and without providing any written guidance to Columbia Harbison about coverage.  Ex. 16.  On March 8, 2012, Columbia Harbison again demanded that First American either engage in settlement negotiations with B&L Harbison, disclaim coverage entirely, or tell its insured specifically what items of loss it believed were covered and what items it believed were not covered, and why.  Ex. 17.  First American's only substantive response was to reiterate its reservation of rights and its position that First American could have no liability until after it litigated the case through an appeal.  Ex. 18.

During the week of March 12-16, 2012, which was two weeks before trial was scheduled to begin on March 26th, First American stopped responding at all to Columbia Harbison's communications and requests for information about its claim.  Ex. 19, 20, 21.  First American would not even respond to a straightforward yes/no email inquiry about its belated reservation of rights: "I need to confirm that I am reading First American's position correctly.  Is First American reserving the right to assert that the policy terms do not provide any coverage for the claims in the pending litigation while also asserting that First American can have no liability if Columbia Harbison enters a reasonable settlement of the pending litigation prior to disposition of all appeals?"  Ex. 21.  Against this backdrop, Columbia Harbison withdrew all settlement

proposals that had been discussed with First American and the adjoining land owner, and relayed to First American that "Columbia Harbison has no choice but to go to trial, accept whatever result occurs, and pursue recovery from First American for all losses resulting from the litigation." Ex. 22.

**G.**    **First American's suit asserting no duty to defend or indemnify**

Without ever having communicated a written determination of coverage and without asking its insured for clarification as to facts surrounding the issuance of the endorsements, First American sued Columbia Harbison the week before trial in the underlying litigation. The primary claim by First American was its first cause of action alleging that First American was defrauded into issuing the endorsements. The target of this bold allegation was Wesley Graybill, a well-respected member of the South Carolina Bar who served as First American's appointed agent and as Columbia Harbison's attorney. First American also asserted a series of contract defenses pursuant to which it asserted it had no duty to defend or indemnify Columbia Harbison.

**H.**    **Resolution of state court action and resultant losses to Columbia Harbison**

Having been sued in this manner, including what it knew to be facially invalid allegations of fraud, Columbia Harbison reopened negotiations with the adjoining landowner. First American was invited to make an offer as part of those discussions, but declined to do so. Ex. 23. Columbia Harbison and B&L Harbison ultimately settled in a way that liquidated the monetary damages and that included agreed-upon contingencies for how the trial court's ruling on the injunction issue would impact the development project and the rights between the parties. Ex. 24. The case then proceeded to trial.

After a week of trial testimony and argument, and post trial briefing, the state court took the matter under advisement. On June 15, 2012, the state court granted a permanent injunction

in favor of the adjoining landowner.  Ex. 11.  Pursuant to the settlement, Columbia Harbison removed the construction that had been completed to date, restored the easement area, and proceeded with a smaller development project.

As a result of the order to remove the structures, Columbia Harbison lost the value of the construction completed to date, incurred costs to restore the easement area, lost market value due to the inability to develop the property in the manner insured against by the endorsements, and incurred increased costs associated with completing a smaller project that was built in order to mitigate the much greater losses that would have resulted had the development project been allowed fail entirely.

## III.  ARGUMENT

**A.     SOUTH CAROLINA RULES OF CONSTRUCTION REQUIRE INSURING CLAUSES TO BE CONSTRUED BROADLY IN FAVOR OF FINDING COVERAGE AND REQUIRE EXCLUSIONS TO BE CONSTRUED NARROWLY IN ORDER TO PRESERVE COVERAGE.**

South Carolina law follows familiar rules of insurance policy construction. Clauses of inclusion are broadly construed in favor of finding coverage, and clauses of exclusion are interpreted narrowly and in favor of preserving that coverage. *E.g., McPherson v. Michigan Mut. Ins. Co.*, 426 S.E.2d 770 (S.C. 1993).   These rules of construction always inure to the benefit of the insured.  *Id.; see also Boggs v. Aetna Cas. & Sur.*, 252 S.E.2d 565 (S.C. 1979).

If a policy provision is susceptible of a reasonable interpretation which would afford coverage, the insured is entitled to coverage as a matter of law.  *E.g., S.C. Budget & Control Board v. Prince*, 403 S.E.2d 643 (S.C. 1991).  Thus, if an insurer fails to include simple language that would unambiguously exclude a certain type of claim, the insured is entitled to coverage if the words actually used in the policy can reasonably be read as not applying to that claim. *Brooklyn Bridge, Inc. v. South Carolina Ins. Co.*, 420 S.E.2d 511 (S.C. Ct. App. 1992).

With respect to the measure of damages, the South Carolina Supreme Court recently declared in no uncertain terms that a title insurance policy is just like any other insurance contract, and as such, the Court is not to be concerned with the merits of desirability of the company's theory in the abstract where it is not dictated by the language actually used in the policy:

> The title policy here does not unambiguously set forth a method of valuation in line with the construction Defendant urges us to adopt. Thus, we need look no further than the general rule that ambiguities in an insurance contract must be construed in favor of the insured.
>
> ******
>
> We conceptually agree with Defendant [title insurer], but we are construing a contract of insurance, not attempting to fashion an equitable remedy. The insurance policy here simply fails to identify the valuation date as the date of discovery of the title defect or otherwise provide clear language that would require a valuation date in line with Defendant's position. The well-established rule concerning construction of ambiguous terms in insurance contracts compels a result adverse to Defendant's position.

*Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012) (answering certified question from this District, and holding that in absence of specific language the Court is required to adopt the damages valuation that is most favorable to the insured).

## C.    THE CONTRACT DEFENSES RAISED BY FIRST AMERICAN IN ITS DECLARATORY JUDGMENT ACTION DO NOT LIMIT THE COVERAGE SOUGHT BY COLUMBIA HARBISON.

As compared to its primary claim for fraud that has been withdrawn with prejudice, First American's contract defenses are pled tersely and almost as an afterthought. The inapplicability of each of these contract defenses is addressed below in the order raised in the Amended Complaint.

### 1.    First American's Second Cause of Action based on Exception 29 does not alter the coverage provided by the endorsements, which is the only coverage sought by Columbia Harbison.

First American's second cause of action is at best confusing. The allegations are:

43. The complaint in the Action filed by B&L Harbison contains causes of action for injunctive relief, trespass, and breach of contract, all related to the Indenture Limited Warranty Deed.

44. Exception No. 29 to the Policy provides that the Policy does not insure against "loss or damage (and [First American] will not pay costs, attorneys' fees or expenses) that arise by reason of" the Indenture Limited Warranty Deed.

45. The trespass and breach of contract causes of action set forth in the Action are therefore specifically excepted from coverage under the Policy.

Amended Complaint ¶¶ 43, 44, 45. First American's theory seems to be that the policy does not cover causes of action for breach of contract or trespass related to the Parking Easement, but that it does cover claims for injunctive relief related to the Parking Easement. Neither Exception 29 (the exception related to the Parking Easement) nor the endorsements affirmatively restoring coverage for the Parking Easement are drafted in this fashion. Instead, both are couched in terms of loss or damage without any reference to a particular legal theory pursuant to which the loss or damage occurs. *See* Ex. 6 @ Schedule B ("this policy does not insure against loss or damage . . .") and Ex. 9 ("Company insures against loss or damage . . .").

Whatever is intended by First American's second cause of action, it does not impact the coverage sought by Columbia Harbison. The complaint by B&L Harbison contains two causes of action—breach of contract and trespass—pursuant to which B&L Harbison sought monetary damages and injunctive relief. *See* Ex. 10. The endorsements issued to Columbia Harbison specifically cover damages resulting from a court order to remove all or a portion of the structures defined in the endorsement, and First American agreed to defend legal proceedings alleging a violation of the Parking Easement that could result in an order to remove the structures. With the exception of one element of the settlement that will be sought under the *Tyger River* doctrine, each category of damages for which Columbia Harbison is seeking

10

recovery is a result of the trial court's issuance of a permanent injunction, which included an order to remove the structures from the easement area.[1]  Those are the damages specifically covered by the endorsement, and also appear to be the damages resulting from injunctive relief that is not the subject of First American's second cause of action.  As such, Columbia Harbison is entitled to judgment as a matter of law because there is no relief to be granted to First American pursuant to its second cause of action.

**2.    Exclusion 3(a) does not apply to risks expressly agreed to and assumed by First American, and Exclusion 3(b) does not apply to matters that arose after the policy was issued in March 30, 2011.**

In its third cause of action, First American cites two related exclusions:

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorney's fees, or expenses that arise by reason of:

3.    Defects, liens, encumbrances, adverse claims, or ***other matters***

    (a)    created, suffered, assumed, or agreed to by the Insured Claimant;

    (b)    not known to the Company, not recorded in the Public Records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an insured under this policy.

Amended Complaint ¶ 48 (emphasis supplied in Amended Complaint).  Courts construing this language have held that subparts (a) and (b) are read in the disjunctive such that they are separate

---

[1]    The settlement resolved all claims by B&L Harbison other than the question of whether the state court would grant the remedy of a permanent injunction. Ex. 24. Columbia Harbison acknowledges that the $300,000 cash payment did not flow from the subsequently issued permanent injunction, and as such is not part of Columbia Harbison's claim for damages covered by the endorsements.  Columbia Harbison will ask for recovery of this amount as part of its claim that First American failed to discharge its duty to enter a reasonable settlement of the litigation against Columbia Harbison that within policy limits.  *See*, *Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.E. 346 (S.C. 1933) (noting that insurer has duty to settle claim against insured if that is the reasonable thing to do, and finding insurer liable for otherwise uncovered losses for failure to discharge this duty).

exclusions.   *Nat'l Credit Union Admin. v. Ticor Title Ins. Co.*, 873 F. Supp. 718 (D. Mass. 1995).   As such, South Carolina law requires subparts (a) and (b) to be analyzed separately. *Auto Owners Ins. Co., Inc. v. Newman*, 684 S.E.2d 541 (S.C. 2009).

> **a.    The undefined phrase "other matters" in Exclusion 3(a) cannot be used to override the affirmative coverage provided by the endorsements.**

With respect to exclusion 3(a), First American alleges only that "[f]urthermore, the matters set forth in the [state court] Action were assumed or agreed to by Columbia Harbison." Amended Complaint ¶ 51. There are several problems with First American's reliance on exclusion 3(a).  First, apart from the Parking Easement insured by the endorsements, there are no defects, liens, encumbrances, or adverse claims that were assumed or agreed to by Columbia Harbison, which leaves the Court to construe the general phrase "other matters."  Under South Carolina law, "[w]hen words of particular and specific meaning are followed by general words, the general words are construed to embrace only persons or things of the same general kind or class as those enumerated." *Ellis v. Taylor,* 449 S.E.2d 487, 488 (1994).  Looking to the present case, there are no "other matters" in the nature of a title defect, lien, encumbrance, or other similar adverse claim against Columbia Harbison's title.

With respect to the matters set forth in the lawsuit by B&L Harbison, the lawsuit was based exclusively on the Parking Easement and B&L Harbison's legal position that the construction of the development project violated the Parking Easement.  This alleged violation of the Parking Easement was the basis for both the actual damages claim by B&L Harbison and the injunction the trial court issued in favor of B&L Harbison.  At its corporate deposition, First American acknowledged that the risk that B&L Harbison could assert these allegations is the exact risk envisioned by the endorsements:

> Q.    Fair to say Endorsement No. 2 and Endorsement No. 3 specifically envisioned that there is a risk of a suit over the endorsement -- excuse me -- over the easement?
>
> A.    I think by virtue of the fact that it mentions court.
>
> Q.    Exactly.  So Susan Stewart knew there was a risk of suit by the adjoining landowner.
>
> A.    Yes.

Ex. 1, p. 189, l. 4-12.  Contrary to First American's allegation that these matters were agreed to and assumed by Columbia Harbison, it was First American that expressly agreed to and assumed the risk that ultimately came to fruition at the conclusion of a hard fought legal battle between Columbia Harbison and B&L Harbison.

Moreover, cases interpreting exclusion 3(a) have held the exclusion only applies to intentional misconduct in causing the title defect.  *E.g. Nat'l Credit Union Admin. v. Ticor Title Ins. Co.*, 873 F. Supp. 718 (D. Mass. 1995) ("The insurer will generally only escape liability under this exclusion [3(a)] if the encumbrance resulted from intentional misconduct").  First American has withdrawn with prejudice its allegations of intentional misconduct for a host of evidentiary reasons ranging from its own witnesses testifying that there was no fraudulent conduct to First American issuing $136,000,000 of title insurance coverage during the pendency of this action using the same appointed agent/attorney that the Amended Complaint alleges committed the fraud.   Columbia Harbison will not address First American's complete failure to support its fraud allegations unless First American's response requires it.[2]

---

[2]    As this Court is aware, an insurer may not avoid its contractual obligations by pointing to alleged errors, miscommunications, or misunderstandings during the underwriting process, no matter how material or significant the alleged breakdown may be.  Instead, in order to avoid liability under the policy, "the burden of proof rests upon the insurer to show, by clear and convincing evidence, not only that the statements complained of were untrue, but in addition thereto that their falsity was known to the applicant, that they were material to the risk, were

b.    The "material facts and matters" alleged in the Amended Complaint do not fall within the scope of exclusion 3(b) because each of those matters arose after Columbia Harbison became an insured under the policy.

As quoted above, exclusion 3(b) applies to allegations of material information "not disclosed in writing to the Company by the Insured Claimant *prior to the date the Insured Claimant became an insured under this policy.*"    Ex. 6, p. 2 (emphasis added).    Under the express language of exclusion 3(b), it is limited to matters existing as of the policy date such that the exclusion does not apply to disclosure of matters that arise after the claimant became an insured under the policy.    *See Paramount Properties Co. v. Transamerica Title Ins. Co.*, 463 P.2d 746, 752 ( Cal. 1970) (holding that, under former exclusion 3(d) addressed to same subject matter, "[b]y the terms of paragraph 3(d), knowledge acquired by the insured after the issuance of the policy clearly would not preclude coverage.").    As will be set forth below each of the alleged "material facts and matters" in the Amended Complaint occurred well after Columbia Harbison became an insured under the policy on March 30, 2011.    As such, exclusion 3(b) has no application to these issues.

The "material facts and matters" asserted in the third cause of action are found in First American's primary claim for fraud that has now been withdrawn with prejudice.    Those matters are: (1) the terms of a Harbison Association Design and Development Review Committee ("DDRC") letter issued on July 5, 2011, purporting to require consent from the adjoining

---

relied on by the insurer, and that they were made with intent to deceive and defraud the company."    *Lanham v. Blue Cross & Blue Shield of S. Carolina, Inc.*, 563 S.E.2d 331, 334 (S.C. 2002).    Under this clear and convincing standard, "fraud 'must be established by evidence which is clear, definite, unequivocal, and satisfactory, or such, as has been said, as to lead to but one conclusion, or as to leave no reasonable doubt' as to the conclusion to be drawn."    *Turner v. Milliman*, 671 S.E.2d 636, 642 (S.C. Ct. App. 2009) aff'd in part, rev'd in part, 708 S.E.2d 766 (2011).

landowner (Amended Complaint ¶¶ 13, 33)[3]; the non-acceptance of an offer by Columbia Harbison to re-purchase the Parking Easement for $260,000 (Amended Complaint ¶¶ 9, 33)[4]; and that, unlike the plans that were provided to First American in October 2010, the final plans that were attached to the endorsements in August and September 2011 contained a retaining wall in the easement area (Amended Complaint ¶¶ 21, 37)[5]. Taking these matters in order, the DDRC letter was received on July 5, 2011; the offer to the adjoining landowner was advanced on June 29, 2011, and notice of non-acceptance received on July 5, 2011; and the revised construction plans with the retaining wall were circulated on August 16, 2011. Amended Complaint ¶¶ 13-14; Ex. 7. Because each of these matters occurred well after Columbia Harbison "became an insured under [the] policy" on March 30, 2011, the express terms of exclusion 3(b) have no application.

Perhaps most telling of all, First American's Amended Complaint does not even allege that the "material facts and matters" should have been disclosed when Columbia Harbison

---

[3]   At the time of its Amended Complaint, First American was well aware that the DDRC letter was provided to the City of Columbia during the permitting process, and the City of Columbia issued a building permit containing no conditions. First American also does not point out that permitting and zoning matters such as the DDRC are not covered by the title insurance policy or the endorsement, and that is why Ms. Stewart readily acknowledged she did not ask any questions about these matters, including the DDRC. Ex. 2 (Susan Stewart Dep.), p. 103, l. 1 – p. 104, l. 11.

[4]   While it does not affect the applicability of the exclusion, Columbia Harbison would clarify what First American does not point out, which is that the offer to buy back the easement rights was not in relation to the construction plans that were attached to the endorsement underwritten by First American. The attempted repurchase of the easement area was to allow a larger project that would be less expensive to construct because it would involve filling in the entire easement area without use of a raised deck. Ex. 3 (Neil Wilson Dep.), p. 149, l. 20 – p. 150, l. 4.

[5]   Again, while it does not affect the applicability of the exclusion, the final construction plans that show the retaining wall are attached to endorsement number 3 and made a part of the policy. Ex. 9. First American acknowledges it issued the endorsement with this drawing attached, and it has withdrawn its challenge to the validity of the endorsement.

became an insured under the policy on March 30, 2011. Instead, First American's allegations under its third cause of action state only that these matters "were not disclosed to First American in writing *prior to issuance of the endorsements,*" which is not what exclusion 3(b) says. *Compare* Amended Complaint ¶ 50 with Ex. 6, p. 2.

This is not to say that First American could not challenge matters arising after Columbia Harbison became an insured under the policy on March 30, 2011, and prior to the issuance of the endorsements in August and September of 2011. Such a challenge, however, cannot be made under exclusion 3(b), but would instead need to be made under First American's primary claim for fraud that has been withdrawn with prejudice because there was a complete absence of evidence that any fraud occurred. Having identified no matters to which exclusion 3(a) or 3(b) apply, Columbia Harbison is entitled to judgment as a matter of law on First American's third cause of action.

> **3.    First American's fourth cause of action that the endorsements only apply to "completed structures" is contrary to the language of the endorsements and is contrary to First American's own interpretation of the endorsement for the five month period during which it defended with no reservation of rights despite full knowledge that the construction project was halted prior to completion.**

The endorsement provides coverage for a court order "requiring the removal of all or a portion of the structures (including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas) designated as HomeGoods, Ulta, DSW and/or Staples (the "Structures") as shown on the site drawing dated 5-20-11, last revised 9-1-11 (the "Plans")." Ex. 9. While no derivation of the word "completed" appears in the endorsement, First American's new position, taken for the first time in this litigation filed over five months after agreeing to defend the lawsuit seeking to stop the incomplete construction project, is that "the Endorsements contemplate coverage only after a structure is completed." Amended Complaint ¶

56.  Instead of being grounded in the policy language, First American's corporate representative agreed that "First American's position that the endorsement only applies to completed structures is because First American has been told that's what Susan Stewart [former underwriter] had in her head."  Ex. 1, p. 199, l. 11-16.  The record demonstrates as a matter of law that what Ms. Stewart is purported to have had in her head is not what was drafted, and is not what anyone, including First American's claims counsel with 30 years of experience as an attorney, understood when they read the words used in the endorsement.

a.    **First American's litigation position is contrary to its own pre-suit interpretation.**

The B&L Harbison lawsuit pursuant to which it sought to enjoin construction specifically recited that construction was in progress at the time of the lawsuit.  Ex. 10, ¶ 8 ("Contractor is now undertaking that destruction [over a portion of the easement tract] and appears to be building a structure on the easement tract . . .").  Yet, First American accepted the defense of the case with no reservation of rights.  Ex. 1, p. 105, l. 4-8.  With respect to the state of construction at the time the temporary injunction was issued, First American acknowledges that it had received pictures and it was "fully aware the structures on the site plan were not complete."  *Id.*, p. 190, l. 11-16.  Had First American really believed the language of the endorsements could only be read as attaching when construction was complete, there would have been no possibility of coverage and no duty to defend, and the appropriate action would have been to disclaim coverage outright.  *Walde v. Ass'n Ins. Co*, 2012 WL 6177947 (S.C. Ct. App. Dec. 12, 2012) (holding that there is no duty to defend where there is no possibility of coverage).

First American went much further than defending without a reservation of rights.  The claims counsel assigned to the case was John Reeves, an attorney in practice for more than 30 years.  Mr. Reeves, with full knowledge of the language of the endorsement and the incomplete

17

status of the construction, testified that he told the insured that he felt there were covered losses.

Ex. 1, p. 93, l. 22 – p. 94, l.7, and p. 106, l. 16-20.

When First American issued a reservation of rights letter four months into the case, its letter to Columbia Harbison specifically recited the incomplete stage of construction:

> The Action was filed during the preliminary stages of construction on the subject property. It is my understanding that none of the structures the Insured desires to build on the subject property have been completed, are close to being completed, or construction has not even begun on some or all of the structures.

Ex. 12, p. 1. Despite reciting this fact which First American now says eliminates coverage, the letter did not take the position that there was no coverage at all based on the stage of completion, and did not take the position that coverage was limited in any manner by this fact.

> Q.    Okay. Is there anywhere in the letter that First American tells its insured that based on what we know now, you do not have any coverage related to this lawsuit?
>
> A.    No, I don't believe there is.
>
> Q.    Is there anywhere in the letter that you tell the insured that based on what we know now, your coverage is limited by the policy?
>
> A.    No.

Ex. 1, p. 81, l. 12-19. On the contrary, First American's corporate representative testified that the February 3, 2011, was a "general reservation if something developed" and that the letter indicated that coverage did exist for the state court action:

> Q.    Would it have been reasonable for Columbia Harbison, the insured, to interpret your letter as confirming that there is at least some coverage for the state court action?
>
> A.    Definitely. I mean, take a look at the defense costs. I mean, we're talking a quarter of a million dollars.

*Id.*, p. 107, l. 4 – p. 108, l.6.  While First American acknowledged the letter did not indicate what First American felt was covered and not covered, its corporate representative explained that he had already given the insured that information orally:   "I made my position verbally as to what was covered and what wasn't covered, whether it was hard costs or soft costs, what was included, what wasn't included."  *Id.*, p. 106, l. 16 – p. 107, l. 10.

> **b.** **Even after this litigation was filed First American acknowledged the endorsement is at least ambiguous with respect to its litigation position that coverage only attaches after construction is complete.**

In responding to a recent request for admission, First American cemented its attempted 180 degree change in position by denying without qualification that "[t]he express terms of Endorsement 2 and Endorsement 3 can be reasonably interpreted as providing coverage during the stage of construction that existed during the period of September 30, 2011 through November 1, 2011." Ex. 25, ¶ 4.  As an initial matter, this denial is tantamount to declarative statement that its own claims counsel with 30 years experience as an attorney acted unreasonably in accepting the defense of the case for a period of five months with no reservation of rights and in affirmatively telling the insured there were covered losses.  Equally troubling, this denial is directly at odds with First American's more candid and less scripted corporate testimony:

> Q.    Do you think the endorsement is ambiguous on the point of whether it applies only to completed structures?
>
> MR. KOUTRAKOS:  Object to the form.
>
> Q.    You can answer.
>
> A.    I don't know if it's ambiguous, but it certainly could be -- I certainly don't think it was -- I don't know – not abundantly clear.

Ex. 1, p. 197, l. 21 – p. 198, l.4.

Susan Stewart, the First American underwriter who approved the final language of the endorsement, agreed with this assessment by First American's corporate representative, and acknowledged the word "completed" was not included in the final endorsement:

Q.   He was asked the question, "Do you think the endorsement is ambiguous on the point of whether it applies only to completed structures?"  After an objection by Mr. Koutrakos, he testified, "I don't know if it's ambiguous but I certainly could be -- I certainly don't think it was -- I don't know -- not abundantly clear."  Do you agree with Mr. Reeves' testimony on behalf of First American?

A.   I agree it could be ambiguous, but to me there were more references in there to being completed.  It makes me think it was intended to be completed.

Q.   But the word -- there's no derivation of the word complete is in Endorsement Number Two?

MR. KOUTRAKOS:  Object to the form.

A.   The word is constructed.  "Would cause the removal of the structures constructed."

Q.   That's in the defense portion of the endorsement?

A.   Yes.

Q.   In the indemnity portion for loss or damage, there is no mention of the word completed?

A.   There is not.

MR. KOUTRAKOS:  Object to the form.

Q.   And the word constructed is not in that portion---

MR. KOUTRAKOS:  Object to the form.

Q.   ---of the endorsement?

A.   It is not.

Ex. 2, p. 128, l. 19 – p. 129, l. 20.

20

Ms. Stewart also confirmed that her initial approved language for the endorsement, which was adapted by its appointed agent and approved by her, did not say anything about either constructed or completed, and that it, too, could be ambiguous:

> Q.    Exhibit 17 contains the language that you suggested for what is the first coverage afforded under Endorsement Number Two, is that correct, indemnity portion for loss or damage?
>
> A.    Yes.
>
> Q.    In Exhibit 17 your language doesn't include anything about the word constructed or completed?
>
> A.    It does not, but it does say those structures as shown on this plat and designated as those buildings, Homegoods, Ulta.
>
> Q.    As we discussed, it could be ambiguous on that---
>
> MR. KOUTRAKOS:  Object to form.
>
> A.    That is the opinion of Mr. Reeves, yes, and it could be ambiguous, I would agree.

*Id.*, p. 130, l. 1-14.

To be clear, Columbia Harbison does not think the endorsement is in any manner ambiguous on this point simply because First American has now taken a new position in litigation based on what it believes its underwriter had in her head.  As it was aptly put by Judge Sanders: "Like Humpty Dumpty, [insurers] have the rare privilege of choosing what their words mean.  But, unlike Humpty Dumpty, they should say what they mean in advance, not after the fact."  *Fowler v. Canal Ins. Co.*, 389 S.E.2d 301, 303 (S.C. Ct. App. 1990).  As it was drafted, the endorsement defines structure to include, without limitation, "all extensions, vertical improvements, supports, and loading/turn around areas," and the endorsement insures against removal of "all or a portion of the structures" with no reference to a stage of completion as is now argued by First American.  By way of illustration, the large retaining wall that was

constructed in the easement area and ordered to be removed is both a vertical improvement and a support, and it forms an integral part of the turnaround area for the buildings.  Ordinary persons would consider the wall to be a "structure" whether it is half complete, 88% complete, or fully complete.  While it may well not be a "completed structure" until it reached substantial completion, the endorsement simply does not say anything about completed structures, and that is why First American's own claims counsel and corporate representative did not read the endorsement in such a strained manner when there was no litigation effort to deny coverage.

Even if this Court were to assume *arguendo* that there exists at least one disinterested person who may agree that First American's litigation position is *one way* to interpret the endorsement, the outcome of this generous assumption would only be to demonstrate that the endorsement is ambiguous.  This theoretical ambiguity would not impact Columbia Harbison's entitlement to coverage because all ambiguity must be resolved in favor of coverage.  *E.g., S.C. Budget & Control Bd. v. Prince*, 403 S.E.2d 643 (S.C. 1991) (holding that insured is entitled to coverage as a matter of law if a policy provision is susceptible of a reasonable interpretation which would afford coverage); *Brooklyn Bridge, Inc. v. S. Carolina Ins. Co.*, 420 S.E.2d 511 (S.C. Ct. App. 1992) (holding that, if an insurer fails to include simple language that would unambiguously exclude a certain type of claim, the insured is entitled to coverage if the words actually used in the policy can reasonably be read as not applying to that claim).  There exists no question that the endorsement is capable of being read as providing coverage during construction of the structures—which is exactly how First American interpreted it for more than five months when it told Columbia Harbison it had coverage—and simply put, that is the end of the analysis under South Carolina law.  Accordingly, Columbia Harbison is entitled to judgment as a matter of law on First American's fourth cause of action.

4.    **Plaintiff's fifth cause of action advances a strained construction solely for the purpose of limiting the coverage provided by the endorsements.**

The Indenture Limited Warranty Deed granted the adjoining landowner "a non-exclusive perpetual easement for the purposes of ingress, egress, and parking across the property." Ex. 5, p. 3. Plaintiff's fifth cause of action seeks to parse this language into two separate easements, one easement for "ingress and egress" and another easement for "parking." As First American's theory goes, the endorsement only references the "Parking Easement," and hence there is no coverage for any allegations that the development project impacted the adjoining landowner's easement for ingress and egress. First American's premise is factually incorrect, and its legal conclusion raises a distinction that creates no difference in coverage.

Factually, the endorsement begins as follows: "[w]ith regard to the non-exclusive easement for parking over the Fee Parcel established by Exception #29 hereof ("Parking Easement") . . ." Ex. 9. The Exception 29 referenced in this quoted language is the complete Indenture Limited Warranty Deed containing the easement granted to B&L Harbison. With the explicit reference to Exception 29, any natural reading of "Parking Easement" is that it is a shorthand reference to the Indenture Limited Warranty Deed, which as quoted above only contains a single, unified easement for "ingress, egress, and parking across the property." Ex. 5, p. 3.

The shorthand reference to "Parking Easement" in this manner traces back to the earliest stages in 2010 when coverage was first being discussed between Mr. Graybill and Ms. Stewart. By way of illustration, in an email exchange on October 6, 2010, under the heading "Harbison Parking Easement," Ms. Stewart specifically discussed First American's willingness to insure access: "I believe you have the right to modify the number of spaces and grades, as well as eliminate the curb cut at the back. I can insure the non-exclusive right of access, etc." Ex. 26.

23

Contrary to First American's litigation position, Ms. Stewart and Mr. Graybill were not attempting to draw fine distinctions with the reference to "Parking Easement."

Legally, the construction project created an indivisible impact on the rights granted by the easement.  In this regard, the state court stated that "the Defendants have taken actions which will forever change and constrict the Plaintiff's rights to parking, ingress and egress across the easement tract."  Ex. 7, p. 21.  Consistent with this conclusion, the state court enjoined Columbia Harbison "from undertaking any sort of permanent construction in the easement area which would interfere with the ingress, egress, and parking as it had been established prior to 2011." *Id.*  The court then ordered Columbia Harbison to remove all obstructions, including the retaining wall, which had been constructed in the easement area.  *Id.* at 22.

Under well-established South Carolina law, the words used in an insurance policy cannot be strained to defeat coverage.  *E.g.*, *Diamond State Ins. Co. v. Homestead Ind.*, 318 S.C. 231, 456 S.E.2d 912 (1995); *Torrington Co. v. Aetna Cas. and Sur. Co.*, 264 S.C. 636, 216 S.E.2d 547 (1975).  Whether viewed as a factual issue or a legal issue, First American's parsing of the Parking Easement and the endorsement language is a strained construction that is being advanced solely for the purpose of creating the artificial appearance that coverage is somehow limited where it is not.  Such a construction is contrary to South Carolina rules of construction, and accordingly, Columbia Harbison is entitled to judgment as a matter of law on First American's fifth cause of action.

**5.    First American lost the right to control settlement when it reserved the right to deny coverage, sued its insured to terminate the defense, and sued its insured to rescind the endorsements based on facially invalid allegations of fraud.**

In its final cause of action, First American seeks to avoid coverage because the settlement entered between Columbia Harbison and B&L Harbison included a provision that Columbia

Harbison would not appeal a trial court ruling for a permanent injunction if that was the result of trial.  Amended Complaint ¶¶ 68-79.  In order to put this argument in context, the settlement was only negotiated after First American filed this action on March 19, 2012, alleging fraud against Columbia Harbison and denying coverage outright.  Moreover, the settlement was the result of negotiations that First American expressly declined to join.  Ex. 23.

With respect to the terms of the settlement, the goal was to stave off the economic ruin that was being caused by First American's insistence on fruitless litigation and its related refusal to settle.  To that end, the settlement included a resolution of the monetary damages at issue in the underlying litigation, and it included alternate remedies in the event the trial court either granted the permanent injunction or denied the permanent injunction.  Ex. 24, ¶¶ 3-4.  Under either scenario, Columbia Harbison would be permitted to proceed with construction after the court ruled.  The only question was whether it would be the original project or a modified project.

Turning to the merits of First American's contention, it is contrary to both the contract language and South Carolina law.  While First American quotes the language of the contract in paragraph 5(b) giving First American the "sole discretion to appeal any adverse judgment" in the event "the Company brings an action or asserts a defense as required or permitted by this policy," First American fails to quote the provisions of the contract setting forth the litigation to which paragraph 5(b) would apply.  That language is found in paragraph 5(a), in which First American unequivocally states that it is only obligated to defend those claims that First American agrees are covered by the policy:

5.     DEFENSE AND PROSECUTION OF ACTIONS

(a)     Upon written request by the Insured, and subject to the options contained in Paragraph 7 of these Conditions, the Company, at its own cost and

25

> without unreasonable delay, ***shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy*** adverse to the Insured. This ***obligation is limited to only those stated causes of action alleging matters insured against by this policy*** . . . . The Company ***will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy***.

Ex. 6, p. 3 (emphasis added).

As of the filing of this action on March 19, 2012, First American had affirmatively demanded this Court to declare that "[t]he Endorsements are void *ab initio* and should be rescinded," and further demanded this Court to declare that "[n]o coverage is provided to Columbia Harbison under the Policy and that First American is not required to defend Columbia Harbison in the Action and is not required to indemnify Columbia Harbison for any matter, loss, or damage related to any order that the Court may issue in the Action." Amended Complaint p. 15, ¶¶ A, C. Far from asserting that it was defending litigation of claims covered and insured by the policy, First American was affirmatively declaring that it had no obligations whatsoever to Columbia Harbison. Having taken this action in this Court asserting that First American had no contractual obligation whatsoever, First American cannot at the same time assert that it had a contractual right to litigate Columbia Harbison into bankruptcy.

Not surprisingly, South Carolina law does not condone such heavy handed positions. In *Hegler v. Gulf Ins. Co.,* the South Carolina Supreme Court held that "there is no material difference in the legal effect between an outright refusal to defend and in undertaking the defense under a reservation of rights until a declaratory judgment is prosecuted to resolve the question of coverage." *Id.*, 243 S.E.2d 443, 444 (S.C. 1978). Consistent with this observation, the court held that insurer's actions in defending under a reservation of rights while pursuing a declaratory

judgment action against the insured "amounted to a wrongful breach of its contractual obligation to defend." *Id.*

In non-legal parlance, neither the contract nor the law allows First American to have its cake and eat it too. Having affirmatively denied the existence of coverage under the policy, First American cannot avoid liability in this action because Columbia Harbison took the prudent step of settling the underlying litigation and avoiding bankruptcy.

**C.**     **PURSUANT TO ITS COUNTERCLAIM FOR BREACH OF CONTRACT, COLUMBIA HARBISON IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO LIABILTY FOR DAMAGES RESULTING FROM THE ORDER ISSUED IN THE STATE COURT ACTION AND FOR ATTORNEYS' FEES INCURRED IN THIS ACTION.**

The second aspect of Columbia Harbison's motion for summary judgment extends to First American's liability for: (1) Columbia Harbison's loss or damage resulting from the order to remove the structures; and (2) attorneys' fees in this declaratory judgment action as an element of contract damages under South Carolina law. As to the first issue, Columbia Harbison seeks an order determining that under the language of the endorsement Columbia Harbison is entitled to recover the loss or damage it sustained as a consequence of the order to remove the construction from the easement area. The amount of damages under this standard will be subject to proof at trial, which will require testimony. With respect to attorneys' fees, Columbia Harbison seeks partial summary judgment on liability under South Carolina law pursuant to which attorneys' fees are awarded as contract damages to an insured who is forced to defend a declaratory judgment action by its insurer.

**1.**     **Columbia Harbison is entitled to recover its loss and damage that occurred as a result of the trial court's order to remove the construction from the easement area.**

With respect to damages, the endorsement insured against:

27

> *loss or damage **resulting from** an Order of Court of competent jurisdiction requiring the removal of all or a portion of the structures (including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas) designated as HomeGoods, Ulta, DSW and/or Staples (the "Structures") as shown on the site drawing dated 5-20-11, last revised 9-1-11 (the "Plans")*

Ex. 9 (emphasis added). At its corporate deposition, First American took the position that the italicized language did not include diminution in value of the commercial real estate or any other damages that followed as a consequence of the order to remove the structures. Instead, after examination into First American's position as to these items, First American's corporate representative succinctly summed up the company's position on what is covered by the endorsement: "we knock it down and put it back the way it was." Ex. 1, p. 128, l. 21. According to First American, nothing else is covered. *Id.*, l. 22-24.

In taking this position that the insuring clause of the endorsements is confined to the cost to "knock it down and put it back," First American has in essence deleted the broad phrase "loss or damage resulting from an order" and inserted in its place the restrictive phrase "the cost to comply with an order." This after-the-fact effort to narrow the scope of the insuring clause in the endorsement is contrary to South Carolina law requiring the court to interpret insuring clauses broadly and to construe the words used in the endorsement using a plain and ordinary meaning. *E.g.*, *Auto-Owners Ins. Co. v. Rhodes*, 682 S.E.2d 857 (S.C. Ct. App. 2009) (insuring clauses construed broadly); *USAA Property and Cas. Ins. Co. v. Rowland*, 312 S.C. 536, 539, 435 S.E.2d 879, 881-882 (Ct. App. 1993) ("In the absence of a prescribed definition in the policy, the term should be defined according to the ordinary and usual understanding of the term's significance to the ordinary person.") (citing *Green v. United Ins. Co. of Am.*, 254 S.C. 202, 174 S.E.2d 400 (1970)); *Sunex Intl. v. Travelers Indem. Co. of Ill.*, 185 F.Supp.2d 614 (D.S.C. 2001) (applying South Carolina law); *State Farm Fire & Cas. Co. v. Barrett*, 340 S.C. 1, 530 S.E.2d 132 (Ct.

App. 2000) (holding that undefined terms should be given their plain, ordinary, and popular meaning); *Fryar v. Currin*, 280 S.C. 241, 312 S.E.2d 16 (Ct. App. 1984) ("[L]anguage contained in a contract must be given its ordinary meaning, except with technical language or where the context requires another denotation.").

Looking to the language actually used in the endorsement, "resulting from" is an inherently broad phrase that extends to the consequences of an event. The Oxford English Dictionary defines "resulting" as an adjective meaning "[a]rising, produced, or obtained as a result; resultant, consequent." *OED Online,* Oxford Univ. Press (December 19, 2012). Likewise, the Oxford American Dictionary defines "resulting from" as "occur or follow as a consequence of something." *The New Oxford Am. Dictionary*, Oxford Univ. Press (3d ed. 2010). The OED defines the root word "result" in similar manner: "to arise as a consequence, effect, or outcome of some action, process, or design." *OED Online*. These definitions are, of course, exactly what ordinary persons understand "resulting from" to mean, and as such, it is how the policy must be interpreted under South Carolina law.

Even if this Court were again to assume *arguendo* that there exists at least one disinterested person who may agree that First American's litigation position is *one way* to interpret the endorsement, this would not alter the outcome as it would at most create an ambiguity. In this respect the South Carolina Supreme Court's recent opinion in *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626 (S.C. 2012) is instructive. In that case, the court accepted that the insurer's approach was reasonable and more equitable, but held that the court was required to reject that approach not dictated by the language of the title insurance policy:

> The title policy here does not unambiguously set forth a method of valuation in line with the construction Defendant urges us to adopt. Thus, we need look no further than the general rule that ambiguities in an insurance contract must be construed in favor of the insured.

29

> We conceptually agree with Defendant, but we are construing a contract of insurance, not attempting to fashion an equitable remedy. The insurance policy here simply fails to identify the valuation date as the date of discovery of the title defect or otherwise provide clear language that would require a valuation date in line with Defendant's position.

*Id.*, 732 S.E.2d at 628.  As such, the court held that it was constrained to adopt the approach that was most favorable to the insured.  *Id.*

In sum, First American's suggested limitation on damages—"we knock it down and put it back"—cannot be reconciled with the words actually used in the endorsements.  The policy covers "loss or damage resulting from [the] order," and under the plain and ordinary definitions of that language, Columbia Harbison is entitled to judgment as a matter of law requiring First American to indemnify Columbia Harbison for its loss and damage that followed as a consequence of the state court order.

> **2.     Each category of Columbia Harbison's damages are a direct result of the order to remove the structures from the easement area.**

Columbia Harbison's motion for partial summary judgment does not seek judgment on a dollar amount of damages, which will require testimony at trial about the specific losses and how they occurred relative to the state court order stopping the development project.  Nonetheless, Columbia Harbison does think it appropriate to familiarize the Court with the types of loss and damage (beyond "tear it down and put it back") that resulted from the state court order and that will be the subject of proof.

The plans attached to the endorsement were for construction of commercial income-producing improvements in the easement area.  The most natural results or consequences of an order to remove commercial income-producing property are: (1) the owner will lose the

construction costs incurred to date; and (2) the owner will lose the income stream from the structures. On this latter point, First American agrees with Columbia Harbison:

> Q.    If the insured removes the structure and is unable to rebuild it, the insured would sustain lost income as a result of the removal of the structures, wouldn't it?
>
> MR. KOUTRAKOS: Object to the form.
>
> A.    I assume so.
>
> ******
>
> Q.    But you would agree with me that a result of the order for the removal of the structures is lost income.
>
> MR. KOUTRAKOS: Object to the form.
>
> A.    Yeah, based on those assumptions that, again, we've gone through, yes.

Ex. 1, p. 122, l. 14-19; p. 123, l. 14-19.

The most familiar impediment to recovery of lost income is that the losses are speculative. *S. Carolina Fin. Corp. of Anderson v. W. Side Fin. Co.*, 113 S.E.2d 329 (S.C. 1960) (noting recoverability of lost profits that have been prevented or lost as the natural consequence of a breach of contract provided such loss is established with reasonable certainty so as not to be conjectural or speculative). Here, there is nothing speculative about this aspect of Columbia Harbison's losses because it is undisputed that the four tenant project was pre-leased with an aggregate annual income of $10,614,000 over ten years.[6]

---

[6]    The commercial lease documents containing the rental figures for Staples, Ulta, DSW, and Homegoods and the notebook containing the documents underlying the damages amounts referenced in the remainder of this section are collectively over 800 pages. Because no action is being requested on these specific damages figures, Columbia Harbison has not added these materials to the Court's file at this time. However, Columbia Harbison does represent to the Court that the dollar figures contained in this memorandum are an accurate reflection of these damages materials which have been provided to First American and which have been the subject of a separate deposition on damages.

Had Columbia Harbison let the project fail as a result of the state court order, Columbia Harbison would have lost more than $10,000,000 in income, would have lost approximately $3,100,000 in construction costs incurred as of the injunction, would have still had to incur $350,000 to remove that construction and restore the easement area, and would have incurred millions of dollars in penalties for failing to deliver the project to the tenants.  Rather than allow these ruinous losses to occur, Columbia Harbison sold McDonalds and Bridgestone, and it took no profit from these sales.  Instead, the proceeds were directed to paying down the existing construction loan that had been frozen, paying contractors, and securing new construction financing to allow a new smaller project to be built outside of the easement area.  Ex. 3 (Neil Wilson Dep.) p. 11, l. 6-14.

Columbia Harbison's efforts succeeded.  Rather than a resulting insured loss that would have exceeded $10,000,000, Columbia Harbison mitigated its losses to approximately $4,500,000 by building the smaller project.  These losses fall into the following categories: (1) site work, including restoration--$831,134; (2) construction costs--$1,098,729; (3) increased architectural costs--$192,347; (4) increased civil costs $45,000; (5) changes orders and net costs savings--$482,947; and (6) lost market value and rent--$1,771,607.  Each category of damage was a direct result of the mitigation effort to avoid the full insured impact resulting from the state court order to remove the structures.

While even these mitigated losses are substantial, they could have at least been cut in half had First American undertaken to negotiate a settlement with the adjoining landowner, who had made an offer of $2,250,000 to allow the original project to proceed to completion.  Ex. 13.[7] Had First American taken that opportunity to discharge its contractual obligations, First

---

[7] As was relayed to First American, the adjoining landowner would have settled for less, but that would have required a settlement offer, which First American declined to make.  Ex. 17, 23.

American could have reduced the amount of its claims exposure because a settlement that removed the title impediment would have satisfied fully First American's obligations under the policy. Instead, First American made the decision to take its chances with a pretextual fraud claim that has now been withdrawn with prejudice. First American, not Columbia Harbison, must bear the consequences of that decision.

**3.      Under *Hegler v. Gulf Ins.* and its progeny, Columbia Harbison is entitled to recover as contract damages its attorneys' fees incurred in defending this action and establishing its right to coverage.**

In the present case, First American reserved its rights to deny coverage, including the duty to defend, on February 3, 2012. The following month, First American brought this action in which it asserted it had no duty to defend or indemnify Columbia Harbison. Under South Carolina law, Columbia Harbison is entitled to recover as contract damages its attorneys' fees incurred in this declaratory judgment action. *Hegler v. Gulf Ins. Co.*, 243 S.E.2d 443, 444 (S.C. 1978).

Since *Hegler* was decided, the rule established by the South Carolina Supreme Court has been confirmed and expanded on many occasions. By way of example, the South Carolina Supreme Court found that the *Hegler* rule applied with equal force where the insured is forced to institute the action against the insurer, a result that was subsequently affirmed by the Fourth Circuit in a case decided by this Court. *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co.*, 274 S.C. 468, 472, 265 S.E.2d 38, 40 (1980) ("Respondent was forced to prosecute this action to enforce its rights under the policy with appellant just as the insured in *Hegler* was forced to defend an action to enforce his rights under the policy with his insurer."); *Liberty Life Ins. Co. v. Employers Reinsurance Corp.*, 73 F.3d 358 (4th Cir. 1995) (affirming this Court's rejection of insurer's argument that S.C. CODE ANN. § 38-59-40 prohibits the award of attorney fees in an

insurance coverage action without a finding that the refusal of coverage was without reasonable cause).  Earlier this year, Judge Duffy recited the long history of *Hegler* and confirmed that the rule applies with equal force to fees on appeal as well as the trial court.  *Jessco, Inc. v. Builders Mut. Ins. Co.*, 2012 WL 1570015 (D.S.C. May 3, 2012).

Unlike some cases which require a more nuanced analysis of *Hegler* to determine its applicability, the present case is a straightforward application of the original *Hegler* fact pattern—an insurer with a defense obligation reserving its rights to deny coverage and suing its insured in an effort to avoid all coverage obligations under the policy.  Having established that First American had a contractual duty to defend and indemnify Columbia Harbison, Columbia Harbison is entitled to partial summary judgment on the issue of First American's liability for Columbia Harbison's attorneys' fees incurred in this action.  The amount of Columbia Harbison's fees will be presented at the conclusion of the damages phase of the case.

## IV.  SUMMARY AND CONCLUSION

On March 19, 2012, First American made the ill-advised decision to sue its insured for fraud instead of honoring its contractual obligations.  As set forth above, a review of First American's contractual defenses, which are pled in conclusory fashion after the now withdrawn fraud claim, reveals that the contract language cited by First American is either inapplicable to Columbia Harbison's claim or otherwise does not operate in the manner suggested by First American.  Accordingly, Columbia Harbison is entitled to judgment as a matter of law on each of First American's contract defenses.

The record further demonstrates that Columbia Harbison is entitled to judgment as a matter of law on First American's position as to the scope of Columbia Harbison's losses

covered by the endorsements and on the issue of First American's liability for Columbia Harbison's attorneys' fees in this action.

Columbia Harbison respectfully requests that it be granted judgment as a matter of law on each of these issues, and that this matter proceed to trial on: (1) the dollar figure of Columbia Harbison's loss and damage resulting from the state court order; (2) the dollar figure of Columbia Harbison's attorneys' fees; and (3) liability and damages pursuant to Columbia Harbison's counterclaim for bad faith.

s/ Kevin K. Bell

_____

Kevin K. Bell [5854]
Robinson, McFadden & Moore, P.C.
Post Office Box 944
Columbia, SC  29202
(803) 779-8900

Counsel for Columbia Harbison, LLC

December 20, 2012