**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| First American Title Insurance Company, ) | Civil Action No.: 3:12-CV-00800-JFA |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | **Response in Opposition to Motion for** |
| ) | **Summary Judgment by First American** |
| Columbia Harbison, LLC, ) | **Title Insurance Company** |
| ) | |
| *Defendant*. ) | |
| ) | |

## I. INTRODUCTION

First American Title Insurance Company's motion for summary judgment has three components: (1) coverage only attached after all structures were complete, and an 11,800 square foot retaining wall is not a structure for purposes of the endorsement; (2) the endorsement does not cover claims for breach of contract and trespass, which would include the $300,000 paid to B&L Harbison; and (3) Columbia Harbison cannot meet two of the four elements of estoppel. None of these issues raised in First American's motion are supported by the record.

First American's first argument is with respect to the fourth cause of action in its declaratory judgment complaint, which alleges that "the Endorsements contemplate coverage only after a structure is completed." Nothing in the language of the endorsements evidences any intent for coverage to attach only after all construction is complete, and the massive concrete and steel retaining wall constructed in the easement area was a structure under any definition of the term. In addition to being a structure in its own right, the retaining wall was also within the additional language of endorsement because it was a support foundation for two of the retail buildings, was a vertical improvement associated with all four retail buildings, and was an integral portion of the loading and turnaround area for all four buildings.

1

First American's second argument regarding coverage for the specific causes of action asserted by the adjoining landowner does not bear on the outcome of the pending motions. While the $300,000 paid to the adjoining landowner is part of Columbia Harbison's claim pursuant to the *Tyger River* doctrine, Columbia Harbison has never asserted entitlement to this element of loss as being directly covered by the endorsements. Nonetheless, the foundation for First American's argument—that the policy and endorsement do not cover claims for breach of contract or trespass—is not supported by the policy language, which is couched in terms of relief as opposed to legal theory giving rise to the relief. As such First American is not entitled to judgment as a matter of law on its second argument.

First American's third and final argument pertains to estoppel. This argument, too, should no longer be outcome determinative because Columbia Harbison has established its entitlement to coverage under the express language of the endorsements. While the claim should be moot, First American's motion as to this claim is factually incorrect, and as such, First American is not entitled to judgment as a matter of law on the estoppel claim.

Each of these issues will be addressed separately below. In lieu of repeating the arguments already briefed in its own motion for summary judgment filed on December 20, 2012, Columbia Harbison will confine the analysis to matters raised in First American's motion that were not specifically addressed previously. Where appropriate, Columbia Harbison will cite to and incorporate by reference relevant arguments that were fully briefed in the first memorandum.

## II. ARGUMENT

**A. NOTHING IN THE LANGUAGE OF THE ENDORSEMENTS SUPPORTS FIRST AMERICAN'S NEW LITIGATION POSITION THAT COVERAGE UNDER THE ENDORSEMENTS ONLY ATTACHES AFTER CONSTRUCTION OF THE RETAIL STRUCTURES IS COMPLETE.**

The endorsement states in relevant part:

> the Company (i) insures against loss or damage resulting from an Order of Court of competent jurisdiction requiring the removal of all or a portion of the structures (including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas) designated as HomeGoods, Ulta, DSW and/or Staples (the "Structures") as shown on the site drawing dated 5-20-11, last revised 9-1-11 (the "Plans")

Ex. 1.

In its first argument, First American advances the argument that this language should be construed to mean that "until such time as the Homegoods, Ulta, DSW, and/or Staples buildings have been actually ***completely constructed*** upon the Columbia Harbison property, they cannot be considered 'structures.'" Memo. (D.E. 62-2) p. 8 (emphasis added). Building on this proposition, First American goes on to state that "there cannot be said to exist any 'extensions, vertical improvements, supports and loading/turn around areas for any of the named 'structures' upon the Columbia Harbison Property because none of the named 'structures' exist." *Id*. In other words, even if one builds a support, vertical improvement, or turn around area associated with the project and the retail units, these additional structures "cannot be said to exist" until the retail structures are completely constructed. This argument, advanced for the first time in this litigation commenced over five months after First American accepted the claim with no reservation of rights, has no support in the language of the endorsement, the English language, City of Columbia zoning codes, or First American's corporate testimony.

3

### 1. The endorsement contains no language evidencing the intent for coverage to only attach after the retail structures were completed.

The starting point of any contract analysis is the actual language of the contract. In the present case, the endorsement contains no derivation of the word "complete" and makes no reference to a stage of completion for any structures, let alone all of them, in order for coverage to attach. In the context of insurance, this alone is fatal to First American's "completed structures" argument. *E.g.*, *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012) (rejecting title insurance company's date of damages valuation because the policy did not specify that date and did not contain any clear language in keeping with the title insurer's theory). As was set forth at length in Columbia Harbison's summary judgment motion, at no time in the five months that preceded this litigation did First American take the position that coverage only attached after the retail buildings were complete. D.E. 61-1 at pp. 17-19. On the contrary, First American's claims counsel with 30 years experience as an attorney confirmed to Columbia Harbison that there were covered losses. *Id.* Under South Carolina law, the presence of such uncertainty on the part of First American itself compels the rejection of First American's position. *Whitlock.*

First American's argument fares no better even if this Court were to put aside these pre-litigation admissions. While First American's memorandum advances the argument that the endorsement is clear and unambiguous on this point of when coverage attaches, First American's corporate testimony painted a very different picture:

> Q. Do you think the endorsement is ambiguous on the point of whether it applies only to completed structures?
>
> MR. KOUTRAKOS: Object to the form.
>
> Q. You can answer.

A. I don't know if it's ambiguous, but it certainly could be -- I certainly don't think it was -- I don't know – not abundantly clear.

Ex. 2, p. 197, l. 21 – p. 198, l.4. First American's underwriter who approved the endorsement also testified that she agreed the endorsement was ambiguous on this issue. Ex. 3, p. 128, l. 19 – p. 129, l. 20; p. 130, l. 1-14. Charles Hedgepath—who has over 30 years experience in the title insurance industry, including 13 years at First American where he held the titles of State Counsel for South Carolina, Senior Underwriting Counsel for South Carolina, and Assistant Vice-President—also offered the expert opinion that coverage under the endorsements was in force during construction of the improvements:

> Title insurance underwriters have forms and contract language available to them that is used to either limit the amount or existence of coverage pending completion of improvements to the property identified in a title insurance policy. Neither the title insurance policy nor Endorsements 2 and 3 contain any such limiting language. As such, the title insurance policy provided coverage during the construction of the structures shown on the site plans attached to Endorsements 2 and 3.

Ex. 4, p. 2 at d.

Giving First American every benefit of the doubt, the endorsement is at best ambiguous on this point. Under South Carolina law, First American's pre-suit admissions, its corporate testimony during this litigation, the testimony of its underwriter who participated in drafting, and the expert opinions of Mr. Hedgepath all require judgment as matter of law in favor of Columbia Harbison on the issue of coverage attaching prior to completion of construction. *Whitlock*; *S.C. Budget & Control Board v. Prince*, 403 S.E.2d 643 (S.C. 1991) (holding that, in the absence of limiting language, insured is entitled to coverage as a matter of law if policy can be read as encompassing claim); *Brooklyn Bridge, Inc. v. South Carolina Ins. Co.*, 420 S.E.2d 511 (S.C. Ct. App. 1992) (holding that insurer's failure to use four words which would have specifically set

5

forth its purported intent mandated judgment as a matter of law for insured because insured's reading of policy was just as logical as insurer's).[1]

## 2. The word "structure" as used in the endorsement is not limited to buildings.

Coverage under the insuring clause is triggered by a court order "requiring removal of all or a portion of the structures." Ex. 1. In addition to the four retail buildings, the endorsement specifically defines structure as "including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas." *Id.* It is telling that on both occasions when First American quotes the endorsement, it highlights the language that precedes and follows this definitional parenthetical, but First American fails to highlight this language defining structure. See Memo (D.E. 62-1) at pp. 3, 16.

At his deposition taken by First American, Mr. Graybill testified why he added this parenthetical to the word "structure" that was initially introduced by Ms. Stewart:

Q. Tell me why did you add that language [the second parenthetical]?

A. To make sure that the language covered other things other than what you would obviously look at as a vertical improvement, I guess. I mean a structure is – in my opinion, ***the word structure means more than a building, or in this case a deck, it means any type of physical***

---

[1] At the risk of repeating itself, Columbia Harbison wants to be clear that it does not think the endorsement is in any way ambiguous on the issue of when coverage attaches. As set forth in Columbia Harbison's motion, First American's corporate representative testified that "First American's position that the endorsement only applies to completed structures is because First American has been told that's what Susan Stewart [former underwriter] had in her head." Ex. 2, p. 199, l. 11-16. Undisclosed subjective intent does not render a contract ambiguous, especially the language of an insuring clause that must be construed broadly. *McPherson By & Through McPherson v. Michigan Mut. Ins. Co.*, 426 S.E.2d 770 (S.C. 1993) ("[R]ules of construction require . . . clauses of inclusion to be broadly construed.").

***improvement done to the property. And I wanted to make sure that all of those things were covered*** and contemplated when this was interpreted**.**

Ex. 5, p. 44, l. 4-12 (emphasis added).[2]

Ironically, the effect of this language was a centerpiece of First American's litigation strategy when it was still pursuing its now withdrawn fraud claim. In questioning its own underwriter, First American repeatedly referred to this parenthetical language, together with the phrase "*all or a portion of* the structures" as being added by Mr. Graybill to make the endorsement "as broad as possible" in favor of the insured. By way of illustration, First American's initial approach was to create the inference that Mr. Graybill, who was Columbia Harbison's counsel and First American's appointed agent, was somehow doing something improper when he added this language favorable to Columbia Harbison:

> Q. Do you believe Wesley Graybill was acting in the best interest of Columbia Harbison?
>
> A. I believe Wesley was making an effort to act in the best interest of both. He was an agent for the company and represented Columbia Harbison.
>
> Q. Did he tell you that he drafted the language as broadly as possible?
>
> A. No.
>
> Q. Let's go back to Exhibit Number Eight, Wesley's e-mail to Neil Wilson dated August 30. He says, after the first sentence, "I drafted this broadly, in our favor, in hopes of getting it. Will now make that effort. I am hopeful. Thanks." Did he tell you that he drafted it as broadly as possible -- let me back up -- in reading this, who you believe Wesley Graybill is referring to when he used the word our when he is communicating with Neil Wilson?
>
> A. Columbia Harbison.

---

[2] While First American's memorandum contains a wealth of drafting history concerning earlier discussions of possible language for the endorsements in 2010 and early 2011, First American omits entirely this record evidence pertaining to this relevant language of the endorsement that was added and approved in August 2011.

7

> Q. Did Wesley Graybill ever tell you he drafted the endorsement broadly in Columbia Harbison's favor prior to sending it to you?
>
> A. No.

Ex. 3, p. 94, l. 10 – p. 95, l. 6.

Ms. Stewart went on to make clear, however, that Mr. Graybill was only performing his job as an agent when he broadened the language of the endorsement language she had initially proposed, and that as the underwriter it was her role to protect the interests of First American:

> Q. Do you think if Wesley Graybill was acting in the best interest of both Columbia Harbison and First American that he would have drafted the endorsement broadly in favor of Columbia Harbison?
>
> A. I think it's not uncommon for attorney agents to try to get the most that they can for their client, their insured, but they owe a duty to the title company as well at the same time.
>
> ******
>
> Q. You understood that he was acting in the best interest of Columbia Harbison?
>
> A. I understood he was trying to get as much as he could for Columbia Harbison.
>
> Q. And that is who he was working for, he was trying to get the best coverage possible for Columbia Harbison?
>
> A. Yes.
>
> Q. In that respect he was looking out for the interests of Columbia Harbison?
>
> A. Yes.
>
> Q. And you were looking out for the interests of First American?
>
> A. Yes.

*Id.*, p. 96, l. 14 – p. 98, l. 1.

In advocating for its new, and very narrow, interpretation of the endorsement, First American also suggests that Columbia Harbison's reading of the endorsement would render the endorsement broader than what Ms. Stewart had previously agreed to approve. In fact, that is exactly what was intended and what Ms. Stewart agreed to do when she approved the final language:

> Q. . . . I want to start a little bit where Mr. Koutrakos left off, which was the concept of the actual language of Endorsement Two, which is Exhibit Three, is broader than something. Is the language of Endorsement Number Two, Exhibit Three, broader than you agreed to provide?
>
> A. Broader than I agreed to provide October 25, 2010 and previously, but I did approve this.
>
> *****
>
> Q. The differences between the language you had drafted and what you ultimately approved in Exhibit Three, at least as it pertains to the first part, not the legal defense, the legal defense is separate, what differences do you see?
>
> *****
>
> A. . . . Added in Exhibit Three is of all or a portion of the structures and then more specificity.
>
> Q. In the parenthetical?
>
> A. Yes.
>
> Q. I want to stop you there for a second. And that was okay with you?
>
> A. Yes. I approved it.
>
> *****
>
> Q. At the end of [the email transmitting the revised language] he says, "if satisfactory, please send a reply e-mail if you have revisions, please send and I'll incorporate." You had the power of the pen at that point, didn't you?
>
> A. Yes.

9

> Q. And you on behalf of First American chose to accept the language as drafted by Mr. Graybill?
>
> A. I did.

*Id.*, p. 98, l. 12 – p. 100, l. 11.

This agreement to broaden the endorsement was an extension of Ms. Stewart's earlier decision to approve the issuance of affirmative coverage at all, something she initially refused to do. Similarly, Ms. Stewart also agreed to add coverage for defense costs on August 24, 2011, something she had also declined to do in 2010. The result of these decisions by Ms. Stewart on behalf of First American culminated in the August 2011 approval of the broader language that is now before the Court. And as cited by First American, the function of the Court is to enforce the language approved by First American, "regardless of its wisdom or folly, apparent unreasonableness, or failure [of the parties] to guard their interests carefully." *Builders Mut. Ins. Co. v. OakTree Homes, Inc.*, 867 F. Supp. 2d 800, 809 (D.S.C. 2012).

**3. In addition to being a structure in its own right, the retaining wall constructed in the easement area was a vertical improvement, a support, and an integral part of the loading and turnaround area for the retail units.**

As noted by Ms. Stewart, Mr. Graybill's changes specified that structures included the items in the parenthetical—"structures (including but not limited to all extensions, vertical improvements, supports, and loading/turn around areas)." As an initial matter, the structures listed in this parenthetical are all encompassed by the Webster's Dictionary definition of "structure" quoted by First American: "something built or constructed." They are also within the Black's Law Dictionary definition of structure: "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together." Black's Law Dictionary

(9th ed. 2009). The City of Columbia zoning regulations also make clear that a building is one example of a structure, but the term structure is a much broader concept:

> *Building* means any structure having a roof supported by columns or walls and which is designed for shelter, support or enclosure of persons, animals or property of any kind.
>
> *Structure* means anything constructed or erected, the use of which requires location on the ground, or attachment to something having location on the ground, including mobile homes, travel trailers, signs, mobile signs, tubs, swimming pools or other bathing facilities, portable signs and antennas, but excluding from definition as structures the following: minor landscaping features such as ornamental pools, planting boxes, birdbaths, paved surfaces, walkways, driveways, recreational equipment, flagpoles and mailboxes.

Ex. 6, City of Columbia Zoning Ordinance, Sec. 17-55 "Definitions". Charles Hedgepath also testified that the term structure is not limited to buildings, but is instead understood to mean "improvements." Ex. 7, p. 117, l. 23 – p. 118, l. 10. This is also what Mr. Graybill testified to when he was deposed by First American:

> A. . . . the word structure means more than a building, or in this case a deck, it means any type of physical improvement done to the property.
>
> *****
>
> Q. How about what did you mean by vertical improvements?
>
> A. Anything that projects in a vertical direction that's constructed on the ground.
>
> Q. Supports?
>
> A. Anything that supported the improvements that were being constructed.
>
> Q. Loading turnaround areas?
>
> A. . . . That is the area we marked with an X.

Ex. 5, p. 44, l. 8 – p. 45, l. 7; Ex. 8 (drawing marked with "X").

Each of these definitions is to the same effect, and each of them encompasses the retaining wall constructed in the easement area. To illustrate the magnitude of this structure, the retaining wall was approximately 843 feet long, 14 feet high, and 18 inches thick. Ex. 9, (Affidavit of Neil Wilson), ¶ 4. The wall was built from steel and poured concrete that was formed on site, and it was attached to subterranean footers that were 9 feet wide and 2 feet thick. *Id.*, ¶¶ 4, 6. The back portion of the ULTA and Homegoods retail units were elevated over the easement area, and the retaining wall was the support structure for this portion of those retail units. *Id.*, ¶ 8. The loading and turnaround area, which was almost entirely within the easement area, was also elevated such that the retaining wall was the support for and an integral part of the loading and turnaround area for all four retail units, including the raised deck structure behind the ULTA and Homegoods retail units. *Id.*, ¶ 7. Far from being some inconsequential landscaping or grading feature, this massive 11,800 square foot retaining wall structure constructed in the easement area was the vertical improvement and support structure without which the project as designed and permitted could not be completed. *Id.*, ¶ 9.

When the state court ordered that the retaining wall and other construction be removed from the easement area, coverage was triggered under the insuring clause providing coverage for "loss or damage resulting from an Order of Court of competent jurisdiction requiring the removal of all or a portion of the structures." First American's after-the-fact arguments to the contrary cannot be reconciled with the language of the endorsement, its pre-suit conduct, or the record developed in this litigation. Accordingly, First American's motion for summary judgment on its fourth cause of action must be denied.

**B. FIRST AMERICAN IS NOT ENTITLED TO SUMMARY JUDGMENT IN THE MANNER REQUESTED WITH RESPECT TO THE BREACH OF CONTRACT AND TRESPASS CAUSES OF ACTION ASSERTED BY B&L HARBISON, BUT THERE IS NO SUBSTANTIVE DISPUTE AS TO COVERAGE UNDER THE CONTRACT FOR THE $300,000 PAYMENT TO B&L HARBISON.**

In its second argument, First American takes the position that the endorsement does not cover the causes of action for breach of contract and trespass. This argument is the basis for the the second cause of action in First American's amended declaratory judgment complaint. As set forth more completely in Columbia Harbison's summary judgment memorandum, the endorsement covers injunctive relief in the event the court determines the development project violates the Parking Easement, and nothing in the endorsement or the related exception is phrased in terms of the nature of the cause of action pursuant to which this injunctive relief could issue. D.E. 61-1, pp. 9-11, C.1. As such, Columbia Harbison, not First American, is not entitled to summary judgment on First American's second cause of action.

While the foundation for First American's claim is incorrect as a matter of law, Columbia Harbison does not disagree that the there is no coverage under the contract for the $300,000 that Columbia Harbison agreed to pay B&L Harbison under the settlement agreement. Instead, Columbia Harbison is only seeking recovery for that payment pursuant to its claim that First American failed to discharge its duty to enter a reasonable settlement of the litigation against Columbia Harbison that was within policy limits. *See*, *Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.E. 346 (S.C. 1933) (noting that insurer has duty to settle claim against insured if that is the reasonable thing to do, and finding insurer liable for otherwise uncovered losses for failure to discharge this duty). The *Tyger River* claim is not currently before the Court, and as such, there is no relief to be granted pursuant to First American's second cause of action.

## C. WHILE NOT NECESSARY FOR THE DISPOSITION OF THE PENDING MOTIONS, FIRST AMERICAN IS NOT ENTITLED TO SUMMARY JUDGMENT ON COLUMBIA HARBISON'S ESTOPPEL CLAIM.

First American's final summary judgment argument is directed to Columbia Harbison's estoppel claim, which was only pled in response to the new coverage positions First American advanced for the first time in its declaratory judgment complaint. At this stage in the litigation, Columbia Harbison does not believe the estoppel claim is outcome determinative because discovery in this action has borne out what Columbia Harbison believed all along—*viz.* there was no fraud in connection with the endorsements, and Columbia Harbison is entitled to coverage under the endorsement for the loss and damage resulting from a state court order to remove the construction from the easement area. Nonetheless, while not necessary to support Columbia Harbison's recovery, First American is incorrect in its position that it is entitled to judgment as a matter of law on the estoppel claim.

### 1. Elements of estoppel

Waiver may not be used to expand the scope of the risk under an insurance policy, but estoppel may be so used if the insurer has misled the insured into believing the particular risk is within the coverage. *Standard Fire Ins. v. Marine Contracting*, 392 S.E.2d 460 (S.C. 1990). Estoppel does not arise from the insurance contract itself but from the actions of the parties. Eric Mills Holmes & Mark S. Rhodes, Appleman on Insurance 2d § 8.1 (1996). "The essential elements of equitable estoppel are: (1) ignorance of the party invoking it of the truth as to the facts in question; (2) representations or conduct of the party estopped which mislead; (3) reliance upon such representations or conduct; and (4) prejudicial change of position as the result of such reliance." *Crescent Co. of Spartanburg, Inc. v. Insurance Co, of North America*, 225 S.E.2d 656 (S.C. 1976) (quoting *Pitts v. New York Life Ins. Co.*, 148 S.E.2d 369 (S.C. 1966)). "[W]here [the]

elements of estoppel exist, an insurer may be precluded from asserting that a loss was not within the terms of the policy." *Johnson v. Wabash Life Ins. Co.*, 135 S.E.2d 620 (S.C. 1964) (comparing insured's ability to effectively utilize estoppel against an insurer compared to limitations on use of waiver) (citation omitted).

While First American's motion is directed only to the first and fourth elements of estoppel, Columbia Harbison wants to be clear that the impact on coverage of the estoppel claim is more subtle and indirect than First American's motion would suggest. At the time First American's claims counsel confirmed that there were covered losses, First American's position was based on the language of the endorsement coupled with its knowledge that the project was incomplete. First American did not change its position based on what was written in the endorsement or learning new facts about the project. Instead, First American's changed positions because of what it was told about Ms. Stewart's intentions. In this regard, First American's corporate representative agreed that "First American's position that the endorsement only applies to completed structures is because First American has been told that's what Susan Stewart had in her head." Ex. 2, p. 199, l. 11-16. While Columbia Harbison believes First American's new position is contrary to the language of the endorsement and incorrect as a matter of law, Columbia Harbison is not even seeking to prevent First American from advancing its new argument that there is a second way to look at the endorsement. However, as a result of its pre-litigation interpretation of the endorsement, First American should be estopped from advancing the argument that their new position is the *only way* to interpret the endorsement.

2. **First American's position that Columbia Harbison could not be ignorant of the truth is refuted by its own ignorance of its new litigation position.**

The first element challenged by First American is ignorance of the truth. In connection with that element, First American cites authority to the effect that "a party claiming estoppel

15

must 'honestly believe' the truth of the facts in question." Because Columbia Harbison does not claim lack of knowledge of the language of the endorsement, First American argues that Columbia Harbison could not be ignorant as to the scope of coverage, which would include First American's new argument that coverage only attaches after all construction is completed. This Court need look no further First American's corporate testimony to dispense with this contention:

> Q. And on the assumption that I've got the date right of December 8th, that would have been a point where First American had been funding the defense of the case for two months?
>
> A. Right.
>
> Q. And there was no reservation of rights letter at that time?
>
> A. No.
>
> Q. A temporary injunction had been issued.
>
> A. Yes.
>
> Q. And at that point in time you were fully aware the structures on the site plan were not complete.
>
> A. Yeah. I was sent pictures by somebody.
>
> Q. In that call did you tell Columbia Harbison that First American believed the endorsement only applied to completed structures?
>
> A. No.
>
> Q. Why not?
>
> A. I don't think I knew that until talking to Susan Stewart.
>
> Q. You had the endorsement in your possession for two months as of December 8th, 2011; correct?
>
> A. Right.

*****

> Q. . . . So at the time of the call in December, you had not talked to Susan Stewart.
>
> A. Right.
>
> Q. And you did not know that the endorsement only applied to completed structures.
>
> A. Right.
>
> Q. You had had the endorsement in your file since the claim came in.
>
> A. Right. In October -- whatever date that was.

Ex. 2, p. 190, l. 3 – p. 192, l. 11. The legal effect of First American's corporate testimony is obvious—Columbia Harbison, not First American, is entitled to judgment as a matter of law on the issue of whether someone reading the endorsement could "honestly believe" that coverage attached prior to the completion of all construction.

### 3. The prejudice from First American's control over settlement is an issue for trial.

The second element raised by First American is prejudice to Columbia Harbison. According to First American's memorandum, nothing would have changed because Columbia Harbison and its counsel controlled the litigation. D.E. 62-1, p. 30. The affidavit supporting this statement states only that "Columbia Harbison controlled the defense of the state court action," which is a different proposition. D.E. 62-12, ¶ 5. Defending a case is the professional function of an attorney while controlling the litigation includes larger decisions such as whether to settle or pursue an appeal. First American is correct that it did not argue motions, take depositions, or draft discovery responses, but First American did assert control over the litigation. In its reservation of rights letter, First American made clear that "the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves

the right, in its sole discretion, to appeal any adverse judgment or order." Ex. 10, p. 2. First American also informed its insured that "the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured." *Id.* Both of these statements have the same import—if Columbia Harbison wants coverage, First American would make the decision when to settle and whether to appeal.

With trial only weeks away, Columbia Harbison implored First American to either participate in settlement or give a definitive coverage position. Ex. 11. First American would not do either of these things, but First American did take the opportunity to remind Columbia Harbison that "First American shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to title, as insured." Ex. 12. Removing all doubt that First American took the position that Columbia Harbison would settle at its own peril, First American's amended its complaint to add a sixth cause of action seeking to be relieved of liability because it did not consent to the settlement. Amended Complaint, ¶¶ 62-72.

Exactly how the underlying case would have proceeded differently is impossible to know at the summary judgment stage as it would require testimony from all of the parties and counsel in the underlying litigation. Nonetheless, there is no question the litigation would have proceeded differently, and been settled sooner, had First American disclaimed coverage in October 2010 such that Columbia Harbison was free from threats it would lose its insurance coverage if it entered a reasonable settlement. The timing of the settlement with B&L Harbison bears this out. Once First American filed this action disclaiming coverage, Columbia Harbison

reopened negotiations that week and immediately began to bring the matter to a conclusion because it knew it could do so without risking its insurance coverage.

Again, Columbia Harbison does not believe any of these issues will ultimately need to be addressed by the Court because Columbia Harbison is entitled to coverage under the express language of the endorsement. Nonetheless, First American is incorrect in its argument that it is entitled to summary judgment on Columbia Harbison's estoppel claim.

### III. CONCLUSION

For the foregoing reasons, Columbia Harbison respectfully requests that First American's motion for summary judgment be denied in its entirety, and that the Court enter judgment as requested in Columbia Harbison's motion for summary judgment.

s/ Kevin K. Bell

Kevin K. Bell [5854]
ROBINSON, MCFADDEN & MOORE, P.C.
Post Office Box 944
Columbia, SC 29202
(803) 779-8900

Counsel for Columbia Harbison, LLC

January 15, 2013