**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| First American Title Insurance Company, | ) | Civil Action No.: 3:12-CV-00800-JFA |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Memorandum in Opposition to First** |
| | ) | **American's Motion for Summary** |
| Columbia Harbison, LLC, | ) | **Judgment on Bad Faith** |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

## I. INTRODUCTION

Having failed in its effort to use this litigation to avoid insurance coverage for Columbia Harbison's claim that its internal documents confirm it knew existed, First American Title Insurance Company now seeks to use summary judgment to avoid a trial on bad faith. While its supporting memorandum is lengthy due to First American's continued recitation of inadmissible parole evidence and an extended discussion of damages that is not relevant to the issues before this Court, First American's arguments on bad faith are conclusory and self-serving, and as such provide no basis for the requested relief. When these arguments are tested against the facts surrounding First American's handling of Columbia Harbison's claim and its assertion of pre-textual defenses to coverage that were counter to its own internal conclusions, the only conclusion to be drawn is that the bad faith issues to be presented at trial are both genuine and material.[1]

---

[1] Columbia Harbison has filed a separate motion to have a trial on the issues of damages and bad faith transferred to the Court's jury docket. D.E. 103. As that motion is still pending, Columbia Harbison will use the generic reference "finder of fact" to encompass both the Court and a potential jury.

Before turning to the specifics of First American's arguments, it is worth noting that First American has not attempted to negate the existence of factual issues on each specification of bad faith set forth in Columbia Harbison's counterclaims. Instead, First American has attempted to assert its arguments as a "legal silver bullet" to avoid those allegations altogether. In opposing these arguments, Columbia Harbison will not undertake to set forth all of the evidence of bad faith that has come to light in this action. Instead, Columbia Harbison will confine its arguments to the evidence that is directly implicated by First American's motion as opposed to the majority of Columbia Harbison's bad faith allegations that First American elected not to put at issue.

## II. LEGAL STANDARDS

"A motion for summary judgment should not be granted 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600-01 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). "In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in her favor." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606 (4th Cir. 1999).

Certain issues, such as whether a party's conduct was reasonable, are fact intensive inquiries typically not suited for summary judgment. *Scalera v. Electrograph Sys., Inc.*, 848 F.Supp. 2d 352, 367 (E.D.N.Y. 2012) ("The issue of whether an accommodation is reasonable is normally a question of fact, unsuited for a determination on summary judgment."). South Carolina's bad faith law, which is grounded on the reasonableness of the insurer's conduct, has long been held to be an issue for the finder of fact where there are competing inferences to be

drawn from the record. *Nichols v. State Farm Mut. Auto. Ins. Co*., 306 S.E.2d 616, 619 (1983) ("Insurer next argues that even if a tort action exists, the only reasonable inference from the evidence is that the insurance company did not act in bad faith. We have reviewed the record and find that sufficient conflicting evidence was presented to create a jury issue.").

### III. ARGUMENT

A mediation was held in the underlying state court litigation on February 10, 2012. At that mediation, First American came to appreciate what it should have known all along—the insured's losses were huge and would continue to mount, and the adjoining landowner was using that fact to drive up the cost of settling the underlying litigation. Coupled with its knowledge that the insured had little chance of prevailing at trial in the state court action, First American had a choice to make: it could either fulfill its contractual obligations by participating in a resolution of the underlying action or it could switch its focus to finding any reason it could, no matter how tenuous or unsupported, to avoid coverage for what was proving to be a multimillion dollar claim. First American chose the latter, and its claims file demonstrates that it ceased any effort to settle the underlying action between the mediation on February 10, 2012, and the date it filed this action on March 19, 2012.

First American's actions during those five weeks resulted in a reversal of its prior position that the insured had coverage for its claim, a declaratory judgment action that included coverage positions that its own claims personnel did not believe, and allegations of fraud that First American's marketing and underwriting operation did not believe. Yet, even after withdrawing three of its claims, including its primary claim for fraud, and having lost as a matter of law on all others, First American now asks this Court to determine its conduct to be

reasonable as a matter of law. First American's conduct was anything but reasonable as a matter

of law, and its motion for summary judgment on bad faith must be denied.

A.    **In declaring its litigation position reasonable, First American ignores its own internal conclusions about coverage and disregards that its primary reason for not paying Columbia Harbison's claim was a rescission claim that a finder of fact could easily conclude was asserted in bad faith.**

First American's first substantive argument is that "First American had a reasonable basis

for denying coverage for Columbia Harbison's claim." This obviously disputed factual position

is based exclusively on First American's coverage position concerning "completed structures."

First American's argument on this primary issue, which spans the sum total of seven sentences,

begins with a declaration that "First American advanced a good faith, reasonable argument"

followed quickly by a self-serving conclusion that "it cannot be said that First American lacked a

reasonable basis for contesting coverage." Pl. Memo. at p. 11. As an initial matter, this

conclusory argument marks the first time that First American has admitted it denied coverage.

Both at its corporate deposition and in response to a request to admit, First American went to

great pains to *deny* that it had denied coverage. Ex. 1 at ¶ 1; Ex. 2 at p. 36, l. 15 – p. 37, l. 19.

Substantively, First American's effort to use its "completed structure" argument as a

shield to bad faith ignores its own claims records which, contrary to what its lawyers argued to

this Court, demonstrate that First American's claims personnel knew First American had

coverage for Columbia Harbison's claim without regard to the state of construction. In fact, the

completed structure argument is not mentioned in any of First American's claims documents as

an issue affecting the existence of coverage. What is obvious in the claims records is First

American's overarching desire to avoid coverage with a rescission claim that was its primary

cause of action until it was withdrawn with prejudice immediately prior to briefing on summary

judgment.[2]  When the record surrounding these claims is reviewed, a reasonable finder of fact could easily conclude that First American asserted these claims without regard to whether it actually believed them because it did not want to pay a multimillion dollar claim.

1.     **The completed structure argument—which was an add-on position that was advanced for the first time in litigation—was contrary to First American's internal conclusions based on the language of the endorsement and its knowledge the structures were not complete.**

The completed structure argument on which First American relies as its exclusive "reasonable basis for denying coverage" was advanced for the first time in this litigation filed over five months after accepting coverage for the insured's claim with no reservation of rights. Even then the completed structure argument was the fourth of five legal claims asserted in the original complaint.  D.E. 1, ¶ 48.  That claim, which the Court found to be "philosophical and semantic," asserted that the word "structure" could only be interpreted to mean a "completed structure" and hence, until construction of the retail structures on the site plan was complete, there could be no coverage even though, as the Court noted, the word "completed" is not found anywhere in the endorsement.  D.E. 84, p. 11.  Contrary to this philosophical and semantic argument advanced by its counsel, First American's internal claims documents demonstrate that First American's own claims personnel held a view contrary to this external coverage position.

When First American accepted coverage in October 2011, it did so without a reservation of rights.  Ex. 1, ¶ 3.  The week before mediation was to occur on February 10, 2012, which was over four months into the case, First American sent a reservation of rights letter to the insured. Ex. 3.  In reciting the background of Columbia Harbison's claim, the letter specifically stated

---

[2] With respect to the now withdrawn fraud claim, First American's claims file is replete with evidence that a finder of fact could conclude was First American's preoccupation with the conduct of its own appointed insurance agent and the potential impact of that conduct as a way out of coverage.  Ex. 29 (collective exhibit).

that "[t]he Action was filed during the preliminary stages of construction on the subject property . . . [and] none of the structures the Insured desires to build on the subject property have been completed." *Id.*, p. 1. The letter did not, however, set forth that First American held any belief that the incomplete state of construction impacted the existence of coverage in any respect:

> Q. Okay. Is there anywhere in the letter that First American tells its insured that based on what we know now, you do not have any coverage related to this lawsuit?
>
> A. No, I don't believe there is.
>
> Q. Is there anywhere in the letter that you tell the insured that based on what we know now, your coverage is limited by the policy?
>
> A. No.

Ex. 2, p. 81, l. 12-19. The reason the letter did not intimate that the state of construction impacted the existence or extent of coverage was because First American's claims department held no such view. On the contrary, First American testified that its reservation of rights letter was a "general reservation if something developed," and that the letter "definitely" should have been interpreted by the insured as confirming that First American had an indemnity obligation with respect to Columbia Harbison's claim. *Id.*, p. 107, l. 4 – p. 108, l.6.

First American's internal claims documents tell the same story in unequivocal terms. On February 7, 2012, three days before the mediation, claims supervisor Laura Conrad advanced the hopeful email inquiry "so we do, in fact, have a coverage issue?" Ex. 4 at #994. Mr. Reeves' response, "[o]nly as to the amount of covered loss per the affirmative endorsement," quickly threw cold water on that suggestion. *Id.* Affirmation that the only real issue was the amount of the covered loss, not the existence of one, was consistent with Mr. Reeves' prior internal emails as well. On December 1, 2011, Mr. Reeves wrote to First American's South Carolina office about what would trigger coverage under the endorsement, "[i]f the alterations to the easement

were consistent with the plans requested and submitted to Susan [First American underwriter], we have liability. The next question is how much." Ex. 17. This interpretation was authored one week before Mr. Reeves had a conference call with the insured during which First American does not dispute that Mr. Reeves orally informed the insured it had coverage. In discussing that call on December 8, 2011, Mr. Reeves testified that he was "fully aware the structures on the site plan were not complete." Ex. 2, p. 190, l. 13-16; Ex. 1, ¶ 2. Importantly, the interpretation by First American's claims personnel during the claims process was based on two things: the language of the endorsement and its knowledge as to the state of constructions. In other words, its internal positions were based on exactly the evidence the law requires for construing contracts.

Not only did First American's claims personnel not interpret the contract language as applying only to completed structures, its basis for asserting that position in the declaratory judgment complaint was not based on the contract language, but was instead based on what First American was told its underwriter had in her head when she drafted the endorsement:

> Q. To put a wrapper on that, First American's position that the endorsement only applies to completed structures is because First American has been told that's what Susan Stewart had in her head.
>
> A. Yes.

Ex. 2, p. 199, l. 11-16. To that end, First American reversed its earlier coverage position because Mr. Reeves felt his interpretation had to be similar to Ms. Stewart's interpretation. *Id.* at p. 203, l. 17-21. At the risk of stating the obvious, what an underwriter had in her head is not a reasonable basis for denying coverage that First American had already concluded existed when it compared the facts of the claim to the actual written terms of the endorsement she drafted.

In the present case, the Court has already ruled that the contract unambiguously provides coverage, which on its face raises a question of fact as to whether First American reasonably denied coverage. However, even where insurers have raised a competing interpretation of the policy, courts have overruled summary judgment in the insurer's favor on bad faith where the insurer should have realized its contract was ambiguous in that it could be read as providing coverage. *Pedicini v. Life Ins. Co. of Alabama*, 682 F.3d 522 (6th Cir. 2012) (reversing summary judgment on bad faith because insurer should have recognized presence of an ambiguity that the law would require to be construed against insurer). Construing the facts in the light most favorable to Columbia Harbison, the finder of fact could easily conclude that First American was no longer acting in good faith towards its insured when it reversed its internal coverage position in favor of the completed structures argument, but was instead grasping at straws and asserting any position it could articulate to avoid coverage. [3]

2. **The finder of fact will be within its rights to conclude that First American's primary claim for rescission was asserted as a means of avoiding a multimillion dollar claim as opposed to being based on a belief that its allegations of fraudulent intent to deceive were true.**

Under South Carolina law, an insurer may not avoid its contractual obligations by pointing to alleged errors, miscommunications, or misunderstandings during the underwriting process, no matter how material or significant the alleged breakdown may be. Instead, in order to rescind a insurance policy, "the burden of proof rests upon the insurer to show, by clear and

---

[3] Also telling is that during this litigation First American denied a request to admit that "[t]he express terms of Endorsement 2 and Endorsement 3 can be reasonably interpreted as providing coverage during the stage of construction that existed during the period of September 30, 2011 through November 1, 2011." Ex. 5, ¶ 4. Unless First American is willing to stipulate without qualification that its own claims counsel with 30 years experience as an attorney acted unreasonably in accepting the defense of the case for a period of five months with no reservation of rights, in concluding that coverage existed, and in affirmatively telling the insured there were covered losses, this unqualified denial further calls into question the candor First American displayed in advancing its litigation arguments against coverage.

convincing evidence, not only that the statements complained of were untrue, but in addition thereto that their falsity was known to the applicant, that they were material to the risk, were relied on by the insurer, and that they were made with intent to deceive and defraud the company." *Lanham v. Blue Cross & Blue Shield of S.C., Inc.*, 349 S.C. 356, 364, 563 S.E.2d 331, 334 (2002). Under this clear and convincing standard, "fraud 'must be established by evidence which is clear, definite, unequivocal, and satisfactory, or such, as has been said, as to lead to but one conclusion, or as to leave no reasonable doubt' as to the conclusion to be drawn." *Turner v. Milliman*, 671 S.E.2d 636, 642 (S.C. Ct.App. 2009) aff'd in part, rev'd in part, 392 S.C. 116, 708 S.E.2d 766 (2011). Under these standards of South Carolina law, fraudulent intent to deceive is the lynchpin element of a rescission claim without which there is no claim.

In order have a reasonable basis to refuse coverage based on allegations of fraud, the threshold step would be for First American to actually reach the conclusion that it had been misled by a misrepresentation made with a fraudulent intent to deceive. When asked about its corporate decision to sue its insured for fraud based on the conduct of First American's own appointed insurance agent, First American's corporate representative confirmed that its decision to seek rescission could be fairly characterized as being based on "something short of a conclusion that we were defrauded," and was instead "a conclusion that there is enough stuff there to test the waters in court." Ex. 2, p. 54, l. 15 – p. 55, l. 3. While a finder of fact could easily conclude that "testing the waters in court" on fraud allegations as a means of avoiding an insurance claim constitutes bad faith, First American's conduct outside of this litigation compels that conclusion.

> a.  **Concurrent with asserting that its own appointed agent committed fraud as a means of denying coverage to Columbia Harbison, First American continued its lucrative business relationship with Mr. Graybill.**

Wesley Graybill was Columbia Harbison's legal counsel and First American's appointed title insurance agent. After filing this action asserting that Mr. Graybill committed fraud in his dealings with First American on the endorsements at issue in this case, First American did not cancel Mr. Graybill's agency agreement because of the Columbia Harbison matter, and it did not issue any type of reprimand to Mr. Graybill about the Columbia Harbison matter. Ex. 6, p. 24, l. 22 – p. 26, l. 8. On the contrary, First American continued to enjoy the premium income generated by Mr. Graybill through his title insurance agency, which placed more $100,000,000 in title insurance in the seven months after this action was filed.[4][5] Ex. 7. If First American truly believed the naked allegations of fraud it asserted to this Court in an effort to avoid claims liability, its conduct in continuing to use Mr. Graybill as its agent and continuing to split premium income with Mr. Graybill would create a genuine issue of material fact whether First American's reliance upon his conduct to deny coverage to Columbia Harbison was reasonable. In the context of the regulated insurance industry, it would be a per se violation of South Carolina statutory law.

> **b.**      **First American failed to notify the Attorney General as would be required by law if it had any reason to believe its fraud allegations could be true.**

False statements and misrepresentations that occur in the context of the insurance industry are regulated by the Omnibus Insurance Fraud and Reporting Immunity Act in the South

---

[4] First American has stipulated to this amount in lieu of filing the supporting records.

[5] First American ultimately provided notice to Mr. Graybill on October 18, 2012 that it was terminating his agency "without cause" effective November 19, 2012. The timing of this notice of termination was strongly suggestive of retaliation, as it was issued 9 days after the three representatives of First American's South Carolina office were deposed. During those depositions, the State Manager and Underwriter testified as to their dissatisfaction about being deposed. Ex. 6, p. 35, l. 4-7; Ex. 8, p. 38, l. 6-22.

Carolina Insurance Code, which is enforced by the Insurance Fraud Division of the South Carolina Attorney General's Office. S.C. Code §§ 38-55-510, et seq. The Act defines "false statement or misrepresentation" to mean "a statement or representation made by a person that is false, material, made with the person's knowledge of the falsity of the statement and made with the intent of obtaining or causing another to obtain or attempting to obtain or causing another to obtain an undeserved economic advantage . . ." S.C. Code Ann. § 38-55-530. The reporting of a belief or suspicion that a false statement or misrepresentation has occurred is mandatory:

> ***Any person, insurer, or authorized agency having reason to believe that another has made a false statement or misrepresentation*** or has knowledge of a suspected false statement or misrepresentation ***shall***, for purposes of reporting and investigation, ***notify the Insurance Fraud Division of the Office of the Attorney General*** of the knowledge or belief and provide any additional information within his possession relative thereto.

S.C. Code Ann. § 38-55-570(A). Even a first offense of failure to file the mandatory report is a serious matter carry a fine of up to $5,000. S.C. Code Ann. § 38-55-550(A).

First American filed no report with the Insurance Fraud Division as would be mandated if First American had reason to believe what it has represented to this Court was true. Viewed in the light most favorable to Columbia Harbison, a finder of fact could reasonably conclude that First American lacked such a belief when it filed its fraud claim as means of denying coverage.

### c. First American continued to vouch for Mr. Graybill as an insurance agent after accusing him of insurance fraud to avoid Columbia Harbison's claim.

The disconnect between First American's fraud allegations asserted to avoid Columbia Harbison's claim and First American's continued lucrative business relationship with Mr. Graybill's insurance agency is implicated by additional provisions of the Insurance Code that are in place to protect the insuring public. In using Mr. Graybill as its appointed agent for seven

months after this action was filed, First American was affirmatively vouching for his trustworthiness:

> All applicants for a limited lines or special producer's license must be vouched for by an official or a licensed representative of the insurer for which the applicant proposes to act, who shall certify whether the applicant has been appointed a producer to represent it and that it has duly investigated the character and record of the applicant and has satisfied itself that he is trustworthy and qualified to act as its producer and intends to hold himself out in good faith as an insurance producer.

S.C. Code Ann. § 38-43-50(A). This District Court has expressly held that the agent appointment and reporting requirements of the Insurance Code are for the protection of the insuring public who place insurance through appointed agents. *Johnson v. Indep. Life & Acc. Ins. Co. of Jacksonville, Fla.,* 94 F.Supp. 959, 965 (E.D.S.C. 1951) ("The provisions under consideration here are designed not to govern the rights and duties of companies and their agents, but primarily to protect the people of the State who seek to insure their lives and property.").

Matt Lewis, First American's state counsel, testified as to the importance of trustworthiness of appointed agents in order to protect the insuring public who purchases title insurance from First American:

> Q.	Do you agree with Susan Stewart that it is very important for First American to have trust in its appointed agents?
>
> A.	Yes.
>
> Q.	Would you agree that this trust is important not only to protect First American but to protect the persons in the companies that purchase title insurance from First American?
>
> A.	Yes.
>
> Q.	And would you agree that it's important that appointed agents for First American have good character?
>
> A.	Yes.

*****

> Q. Do you agree that persons and companies who purchase title insurance from First American should be able to assume that First American will only have appointed agents who First American believes to be trustworthy?
>
> MR. KOUTRAKOS: Object to the form.
>
> A. Yes.

Ex. 9, p. 17, l. 19 – p. 19, l. 9.

In furtherance of its duty to protect the public, First American is required to affirmatively report a termination for cause, and the surrounding circumstances, to the Director of Insurance. S.C. Code Ann. §§ 38-43-60, 38-43-130. First American did not terminate Mr. Graybill for cause (by reason of the Columbia Harbison matter or otherwise), and in fact, First American did not even issue any type of written reprimand to Mr. Graybill. Ex. 6, p. 24, l. 22 – p. 26, l. 8. Instead, First American continued to vouch for Mr. Graybill's trustworthiness and good character for over seven months in order to reap the economic rewards of its lucrative agency agreement with Mr. Graybill, which was a business relationship that produced in excess of $100,000,000 in title insurance for First American after this action was filed. Viewed in the light most favorable to Columbia Harbison, a finder of fact could conclude that First American did not believe it had been misled by a fraudulent misrepresentation, but was instead only using that allegation only as a means to deny coverage.

**d. First American's investigation into fraud was inadequate and self-interested.**

Susan Stewart, an attorney who has practiced law for 28 years in South Carolina, was the state counsel for First American who underwrote and approved the endorsements that provide coverage in this action. She is the only First American employee who actually interacted with Mr. Graybill during the underwriting process that spanned a year.

First American's corporate representative testified that it would be important to First American to know whether Ms. Stewart believed Mr. Graybill lied to her, committed fraud, or intended to deceive First American. Ex. 2, p. 48, l. 13-16. Yet, remarkably, when it instructed its counsel to interview Ms. Stewart less than a month before it filed its lawsuit, First American made no effort whatsoever to ascertain this important information that was fundamental to the fraud claim it asserted against Columbia Harbison based on Mr. Graybill's conduct:

> Q. Did Mr. Koutrakos ask you if you trusted Mr. Graybill?
>
> A. I don't believe so.
>
> Q. Did Mr. Koutrakos ask you if you thought Mr. Graybill committed fraud on First American.
>
> A. I don't think he did.
>
> Q. Did Mr. Koutrakos ask you if you thought Mr. Graybill lied to you?
>
> A. No. I don't believe he did.

Ex. 10, p. 135, l. 14-22.

First American was the party that noticed Ms. Stewart's deposition in this action, yet even then First American still did not ask her any questions about fraud even though her deposition was taken six weeks after its corporate representative testified this information would be important. Instead, Columbia Harbison's counsel had to ask Ms. Stewart these questions which went to the heart of First American's allegations on which it had the burden of proof:

> Q. If in your conversations with Mr. Graybill there was information that was miscommunicated or was inaccurate in some fashion, do you believe Mr. Graybill intentionally and fraudulently misrepresented information to you with the express intent of deceiving you into issuing coverage?
>
>     MR. KOUTRAKOS: Object to the form of the question.
>
> A. I do not.

Q.     If there was a failure on the part of Mr. Graybill to communicate information to you that perhaps you believe an agent of First American should have communicated, do you think that failure would have been the result of Mr. Graybill intentionally and fraudulently holding back information with the express intent of deceiving you into issuing coverage?

         MR. KOUTRAKOS:  Object to the form of the question.

A.     No.

Q.     Do you think Mr. Graybill would lie to you?

A.     No.

*Id.*, p. 133, l. 10 – p. 134, l. 5.

Relevant to First American's claims investigation, Ms. Stewart confirmed that she would have shared this critical information with First American during the pre-suit interview if they inquired about it:

Q.     If Mr. Koutrakos had inquired about whether you believed Mr. Graybill lied to you or committed fraud on First American, would you have told him the same things you told me a few minutes ago?

         MR. KOUTRAKOS:  Object to the form.

A.     I would have.

*Id.*, p. 135, l. 23 – p. 136, l. 3.

First American also failed to discuss the background of the endorsements with Mr. Graybill, even though he invited them to do so at the outset:

Susan and I have been corresponding on this matter on and off since last October. It will be difficult for you and/or claims counsel to understand all of this without talking to me. I can provide the background and information on how things progressed over the past year. Let me know if we need to schedule a call.

Ex. 11 at #3923.  Given that Mr. Graybill was one of the two parties involved in the insurance transactions, and that he was First American's own appointed insurance agent, First American

should have wanted to get as much information as possible from Mr. Graybill if its intent was to conduct a good faith investigation.

Viewed in the light most favorable to Columbia Harbison, a finder of fact could easily conclude that First American's investigation into its fraud claim was both self-interested and incomplete, if not entirely pre-textual, and was designed only to look for facts to deny coverage as opposed to facts that would be counter to this desired result.

### e. As originally presented to the Court, First American's fraud claim was based on factual allegations for which there was a complete absence of support.

In its original Complaint, the first factual allegation of First American's fraud claim was:

> Columbia Harbison failed to disclose to First American the following material facts: (1) the DDRC required the consent of B&L Harbison for the construction to proceed; (2) on the same day [July 5, 2012] Columbia Harbison was notified of the DDRC's requirements, Columbia Harbison made an offer to B&L Harbison to in essence terminate the easements in exchange for $260,000; and (3) B&L Harbison rejected the offer on that same day.

D.E. 1, ¶ 1; also ¶¶13-14. In its interrogatory answers, First American stated that it only filed the fraud complaint "[a]fter acquiring and *confirming* information throughout the course of its investigation of Columbia Harbison's claim and *confirming* Columbia Harbison did not provide First American with *material facts as outlined in the Complaint*." Ex. 12, ¶¶ 10, 11 (emphasis added). The problem with its Complaint and interrogatory answer is that it is undisputed that the referenced offer in the Complaint had no relation to the DDRC letter as the offer was made on June 29, 2011, well ahead of the DDRC letter dated July 5, 2011, and instead of being rejected on the day it was made, the offer was not even responded to a week later when Columbia Harbison followed up with B&L Harbison. Ex. 13, p. 176, l. 20 – p. 177, l. 24; Ex. 14. First American's corporate representative could offer no insight into what First American reviewed to

confirm this material information as alleged in the original complaint, which in reality was incapable of being confirmed.  Ex. 2, p. 60, l. 25 – p. 63, l. 6.

Coupled with evidence that First American had failed to respond to three requests from its insured for information about coverage the week before it filed this lawsuit, and the evidence that First American was in a hurry to fend off additional requests by the insured, a finder of fact could easily conclude that First American was more concerned with filing its fraud claim that it was concerned with the actual correctness of its facts. Ex. 15 ("I believe we should get that [Complaint] filed today as insured's coverage counsel continues to hammer us for a coverage determination letter."); Exh. 16 (unresponded to emails dated March 12, 13, and 15, 2013).

**B.      First American's discussion of damages is premature and provides no support for summary judgment on bad faith.**

First American's second argument on bad faith is really no argument at all, but is instead a thinly veiled effort to begin work on the damages issues that are the subject of trial.  As the argument goes, First American cannot have committed bad faith because Columbia Harbison asked for too much money.   The problems with this approach are both procedural and substantive.  As a procedural matter, First American's seven-page discussion of damages, which is devoid of any citation to bad faith law, is one which would have been appropriate at the original dispositive motions deadline of December 20, 2012.  First American made the conscious decision not to delve into damages issues at that time because it wanted to avoid coverage altogether, and as such it cannot do so now under the guise of a summary judgment motion on bad faith.  Indeed, at the conclusion of First American's "argument" on this point, it expressly states that it "does not intend . . . to have the Court decide at this time the precise limits of the amount Columbia Harbison can recover," but is "simply pointing out that the bulk of the $4 million plus Columbia Harbison seeks by its claim under the endorsement is not properly

payable." Pl. Memo. p. 18. Yet First American's bad faith argument—it cannot have acted in bad faith because the claimed damages are not recoverable—would only be proper if First American had asked the Court to declare that the damages were not recoverable as a matter of law, and that is an issue well beyond the scope of the present motion.

Substantively, First American's argument is legally flawed because it did not merely "contest the claim as made" as stated in its conclusion, but instead denied all coverage under the endorsement, and indeed denied the endorsement was even enforceable until that claim was withdrawn with prejudice on December 3, 2012. Thus, whatever the amount First American ultimately chooses to argue at trial is covered by the endorsements, First American chose not to pay any of it, and the finder of fact is entitled to decide whether that decision to deny coverage outright was reasonable or in bad faith.

Finally, while Columbia Harbison will not take the bait to turn what is supposed to be a motion on bad faith into a referendum on the damages issues that this Court has scheduled for trial, it will point out that there are genuine issues for trial under First American's various positions, both with reference to South Carolina law and with reference to First American's own internal claims documents.

For example, First American describes lost market value as "the most obviously misguided category." *Id.* at p. 15. The South Carolina Supreme Court does not agree:

> Depending on the circumstances, the loss of a title's value can be measured in a variety of ways. For instance, an owner's loss can be the fair market value of a portion of property which has proven completely unmarketable; the cost of removing the defect from the property; or the difference in the values of the property with and without the defect. . . . The terms of individual insurance agreements can control the method of valuation, but the purpose of title insurance has been stated as seeking to place the insured in the position that he thought he occupied when the policy was issued.

*Stanley v. Atl. Title Ins. Co.*, 661 S.E.2d 62, 65 (S.C. 2008) (citing 46 C.J.S. *Insurance* §§ 1736,

1739 (2007)). With respect to commercial income producing property, the C.J.S. section that the

court cited three separate times states "when title to commercial property is insured, the correct

method of valuation is the capitalization of income approach. Furthermore, the insured may be

able to recover consequential or special damages, such as lost profits, as damages for breach of a

title insurance contract." 46 C.J.S. *Insurance* § 1736. Whatever the amount of covered loss

turns out to be when all evidence is presented to the finder of fact at trial, these damages issues

are not suitable for summary judgment under a motion ostensibly directed to bad faith.

First American also takes issue with the loss Columbia Harbison sustained by reason of

structural steel that could not be re-used and the pre-cast deck that was custom fabricated for this

project, which ultimately had to be sent to the landfill as a result of the state court's order that

precluded installation of the deck in the easement area. Pl. Memo. p. 17. First American took a

different position in December 2011 in a conference call with the insured:

> Q.   Did Mr. Reeves ever make any representations to you as to what the policy and the endorsement does not cover?
>
> A.   The closest I could come to that answer is I had a conference call with Cal, myself, my brother, Maude with John in which we tried to pindown exactly what First American would consider coverage and what they would consider outside of coverage. We had sort of a laundry list and went through different items and John gave me his opinion at that point.
>
> Q.   What was his opinion?
>
> A.   He didn't feel like soft cost was covered. He didn't feel like loss of profits was covered. He didn't feel like delays from not meeting tenant obligations was covered. He felt like what was covered was all the structures, improvements, deck related. I asked the question if the Home Goods building is on that part of that plan and we can't build Home Goods and we have materials, is that covered and he said yes. We talked about, I don't have the sheet in front of me, but Maude took very good notes and she could probably give you better information than I can, but it was the blocks that was ordered for Home Goods, is that an item that would be

> considered a covered expense. He said, I believe his answer was yes. The steel that was ordered for Home Goods would that be considered a covered expense.

Ex. 13, p. 114, l. 6 – p. 115, l. 6. Again, despite First American's arguments to the contrary, when viewed in the light most favorable to Columbia Harbison there are genuine issues for trial on these items which First American now seeks to exclude from coverage.

Finally, the testimony above creates additional issues of material fact related to bad faith because First American was telling its insured items such as tenant obligations on leases were not covered at the same time it was having a very different conversation internally. As quoted above, Mr. Reeves told Columbia Harbison on December 8, 2011, that these items were not covered, and this is documented in a February 7, 2012, internal email: "I made our stance clear to the insured regarding coverage." Ex. 4 at #995. Contrary to First American's clear stance offered to its insured in December 2011, First American's internal emails from that same time period reveal no such certainty: "The next question is how much. Are we liable for the leases as well as the physical restoration? That's a million dollar question and we're still working on it." Ex. 17. In fact, this question was still an open question in February despite what First American was continuing to tell its insured:

> The insured has claimed losses for loss of the value of the leases of the proposed shopping center tenants and other consequential damages adding up to the 2.2 million. ***It is nigh impossible to determine from the emails exactly what Susan intended***; but the agent who talked into it was smart. He first excepted the easement from his policy before asking Susan to make the endorsement, shielding him from us for recovery. I still cannot believe she did it.

Ex. 4 at #996 (emphasis added).

The larger point of this discussion in the context of the present summary judgment motion is, of course, that these and other damages matters are all issues for trial. Since First American has represented that it is not asking these issues to be decided at this time, this Court

should take First American at its word and refuse the invitation to address these damages issues on summary disposition based on an incomplete record.

**C.      First American's argument regarding damages for its claims practices is based on an incorrect assumption that Columbia Harbison is not seeking punitive damages for First American's bad faith claims practices that included and culminated in First American's failure to pay.**

In its final argument, First American advances a narrow two prong position with respect to the allegations that its claims process, investigation, and handling of the claim failed meet required standards of good faith: (1) there is no evidence that Columbia Harbison sustained consequential damage because of First American's bad faith claim handling "as opposed to its failure to pay benefits;" and (2) there is no evidence that First American unreasonably refused to settle the state court action. First American's arguments are misplaced and provide no basis for summary judgment.

**1.      First American's arguments are based on an incorrect interpretation of Columbia Harbison's claim for common law bad faith, which is based on all of First American's acts of bad faith that culminated in its breach of the insurance contract.**

The most fundamental flaw in First American's argument is that it is based on an entirely incorrect interpretation of Columbia Harbison's common law claim for punitive damages. In footnote 3, First American states that "Columbia Harbison's Second Counterclaim for statutory bad faith is based on First American's refusal to pay benefits under the endorsement, while its Third Counterclaim for common law bad faith appears to be limited to First American's handling of Columbia Harbison's claim and defense of the state court action." This characterization is not correct. [6]

---

[6] In addition to mischaracterizing the claims themselves, the paragraph numbers cited in First American's footnote appear to reference the original counterclaims as opposed to the amended counterclaims asserted in response to First American's amended complaint. In addition to the

Columbia Harbison's second counterclaim for statutory bad faith, which involves an award of attorney's fees, includes the factual allegation "First American has **failed to discharge its** statutory and **contractual obligations in good faith and has acted without reasonable cause in forcing Columbia Harbison to litigate this action in order to obtain the benefits of its insurance policy**." D.E. 19 at ¶ 76 (emphasis added). The common law claim for bad faith, which involves punitive damages, incorporates the preceding allegation [*Id.* at ¶ 78], and further alleges that "First American had a duty of good faith and fair dealing that required First American **to use due care not to deprive Columbia Harbison of its rights under the insurance contract** . . ." *Id.* at ¶ 79. The counterclaim also asserts a number of failings in First American's claims process, which included failing to make reasonable efforts to settle the underlying litigation within the coverage provided by the endorsements, suing Columbia Harbison to rescind the endorsements, suing Columbia Harbison to avoid all obligations under the policy, asserting facially invalid factual allegations that have been withdrawn, and forcing Columbia Harbison to hire counsel to defend against objectively unreasonable coverage positions. *Id.* at ¶ 80, i, l-o. The counterclaim concludes that "First American's acts of bad faith, individually and collectively, have exposed Columbia Harbison to substantial economic harm and consequential damages, have threatened the viability of the construction project at issue, and have placed Columbia Harbison in an unreasonable and unnecessary position with respect to its tenants, its lenders, and its contractor." *Id.* at ¶ 81. Pursuant to this claim Columbia Harbison seeks "actual damages sustained as a result of First American's bad faith, and an award of punitive damages." *Id.* at ¶ 82.

---

allegations set forth in the original counterclaim, the amended counterclaim included specifications l, m, n, and o. Columbia Harbison will address only the amended counterclaim as it is the pleading before the Court.

As has been briefed to the Court in the first round of summary judgment motions, Columbia Harbison's view of damages is that all of its damages apart from the $300,000 it paid in settlement of the state court action are contract damages recoverable under the endorsement; First American's contrary view is that a large portion of those losses resulting from the state court order are consequential damages. For purposes of bad faith and summary judgment in particular, how these competing views are resolved at trial is not a material issue of fact because the law of the case is that First American breached the insurance contract by filing its lawsuit alleging that the endorsement was void and/or provided no coverage at all with respect to the state court order. The result of this breach was First American's failure to pay Columbia Harbison's actual damages (however that amount is resolved at trial) and consequential damages (if any are characterized as such) measured by the losses sustained on the development project. Since this is not a case where the insured is seeking damages for bad faith in the absence of a breach of contract, First American's summary judgment on this point is entirely misplaced.[7]

In addition to being based on incorrect characterization of Columbia Harbison's counterclaim for common law bad faith, First American does not attempt to negate the existence of a genuine issue of fact for trial on any of the following specifications of bad faith set forth in Columbia Harbison's counterclaim, which individually and collectively form the basis for Columbia Harbison's claim that First American acted in bad faith in depriving Columbia Harbison of its rights under the policy:

      a.      Failing to conduct a proper claims analysis;

---

[7] While not an issue in this case, South Carolina law does hold that breach of an express term of the insurance contract is not required for a bad faith action. *Tadlock Painting Co. v. Maryland Cas. Co.*, 473 S.E.2d 52, 54 (S.C. 1996) ("[Insurer] argues, however, that an insured can only bring a bad faith action if the insurer has breached some express contractual provision. We disagree.").

b.      Conducting a claims investigation in a self-interested and pretextual manner designed to avoid acknowledging losses covered by the policy;

c.      Failing to render a timely determination as to the coverage provided by the insurance policy;

d.      Failing to act with diligence and promptness to protect Columbia Harbison from consequential losses as a result of the underlying civil action;

e.      Accepting coverage without any reservation of rights, and belatedly attempting to reserve its rights to deny coverage only after the underlying litigation had reached the point where substantial losses were imminent;

f.      Issuing a reservation of rights letter that contained no indication of what claims or losses First American believed were not covered by the endorsements;

g.      Failing to respond to reasonable requests from Columbia Harbison about First American's claims process and claims position, and refusing to provide any written guidance to Columbia Harbison about what types of losses First American believed to be covered by the affirmative endorsements despite repeated requests for such guidance;

h.      Failing to inform Columbia Harbison of its coverage position at a point in time when Columbia Harbison could attempt to control its exposure and mitigate its losses in the underlying litigation;

* * * * *

j.      Refusing to respond to a request by Columbia Harbison for permission to resolve its exposure in the underlying litigation in a manner that would allow Columbia Harbison and First American to litigate coverage under the insurance policy;

k.      Acting in its own self-interest in asserting policy limitations on Columbia Harbison's ability to protect its own interests while having no reasonable belief that the underlying litigation would ultimately be resolved in Columbia Harbison's favor;

l.      Invoking contract language that purported to limit Columbia Harbison's ability to protect its own interests after First American reserved the right to deny coverage, sued Columbia Harbison to rescind the endorsements, and sued Columbia Harbison for declaratory relief to eliminate all obligations under the contract;

m.      Attempting to avoid its contractual obligations by suing Columbia Harbison for fraud when it knows or should know that all information that is the

subject of the fraud claim is not material to the risk to be insured and was known to First American's appointed insurance agent;

n.     Attempting to avoid its contractual obligations by suing Columbia Harbison for fraud with no reasonable basis for any belief that an employee or member of Columbia Harbison participated in any alleged non-disclosure of material information; and

o.     Forcing Columbia Harbison to incur legal expenses to defend causes of action based on facially invalid factual allegations, which have since been abandoned, and coverage interpretations that are objectively unreasonable.

*Id.* at ¶ 80. Having breached its unambiguous insurance contract as a matter of law, and having failed to make any effort to negate the specific allegations of improper claims handling, these issues of bad faith that are supported by the evidence are for the finder of fact to determine at trial and are not appropriate for summary judgment.[8]

**2.     The reasonableness of First American's refusal to settle and refusal to permit Columbia Harbison to settle are issues for the finder of fact.**

It is undisputed that First American did not settle the case, would not permit Columbia Harbison to settle, and would not provide a written analysis of coverage that would allow Columbia Harbison to make informed decisions about controlling its own exposure in the underlying action. Instead, First American asserted that it had the right to control settlement even after it reserved its rights to deny coverage. In fact, First American went so far as to testify in this case that it had the right to control settlement even after it had filed this action to rescind the endorsements that were the source of coverage:

Q.     Okay. You filed the declaratory judgment action on March 19th, 2012; is that correct?

A.     Yes.

_____

[8] In addition to the facts cited within this memorandum, these allegations of bad faith are also addressed in the expert report by Gerald M. Finkel, which is attached as Exhibit 18.

Q.      And in that action you accused the insured of committing fraud; is that accurate?

A.      Yes.

Q.      And in that action you allege that the endorsements were void because of fraud on behalf of the insured; is that correct?

A.      Yes.

Q.      Is it First American's position that Columbia Harbison was contractually prohibited from settling at the same time that First American was suing Columbia Harbison for fraud to avoid the endorsements?

A.      Yes.

* * * * *

Q.      So in First American's position, the fact that it was filing a lawsuit seeking to declare the policy endorsements do not exist does not impact the rest of the contract and Columbia Harbison's ability to settle the case?

A.      That's the position, yes.

Ex. 2, p. 137, l. 20 – p. 139, l.6.[9]

Because First American did not engage in any settlement discussions with the adjoining landowner after the mediation on February 10, 2012, Columbia Harbison kept in contact with B&L Harbison's counsel and made various overtures to B&L Harbison in an effort to keep discussions alive. *See* Ex. 19. First American's motion implies that nothing was or would have been different because of its conduct in refusing to settle and refusing to permit Columbia Harbison to settle, but this conclusion is refuted by the fact that Columbia Harbison immediately

---

[9] Internal claims documents reveal that First American does not actually believe this position that it espoused externally both before and during this litigation. On March 19, 2012, the day it filed this action, claims supervisor Laura Conrad emailed that it was not true that Columbia Harbison needed anything from First American in order to settle, and in another email dated March 8, 2012, she even expressed optimism that Columbia Harbison would settle: "Our counsel said don't be surprised if we see our insured and the plaintiff settle prior to Monday. We can then merely concentrate on what portion of that settlement we may or may not owe!" Exs. 15 and 20.

settled the underlying action once this action to deny coverage was filed. While it will be for the finder of fact to determine the exact effects and consequences of First American not permitting settlement at an earlier juncture at a time when the value of settlement would have been lower and perhaps Columbia Harbison could have saved its project, the record viewed in the light most favorable to Columbia Harbison negates First American's argument that its conduct had no impact.

     **3.**    **The reasonableness of First American's "settlement efforts" is an issue for the finder of fact.**

Contrary to its motion made with reference to a single settlement opportunity, First American had multiple opportunities to shield itself from bad faith by pursuing settlement within the contours of what its internal documents reveal was First American's assessment of liability based on its narrow view of coverage.

For example, on February 27, 2012, two weeks after mediation, First American increased its settlement reserve to $900,000. Ex. 21. In the memorandum that accompanied this increase, First American detailed the mediator's belief that the case could be settled for $1.5 million, and it set forth the proposal from the insured to split the settlement with First American's share being a payment of $875,000. *Id.* The memorandum also recognizes that the insured's losses would go up substantially after March 1, 2012. *Id.* Viewing this evidence in the light most favorable to Columbia Harbison, the finder of fact could easily conclude that, if First American had pursued this information from the mediator, there could have been a settlement that would have allowed the original project to go forward and that would have eliminated the majority of losses that are the subject of this action, including the $300,000 Columbia Harbison had to pay to settle in a way that permitted the smaller project to proceed. Importantly, while Columbia Harbison categorically disagrees with First American's narrow assessment of covered damages, the

entirety of the $875,000 discussed in its memorandum was even within First American's $900,000 settlement reserve established in keeping with that view of coverage.

First American had other options to settle that it does not discuss. Columbia Harbison advanced a proposal whereby it would seek to the settle the underlying action if First American would agree to contribute $250,000 and permit litigation to resolve the other damages over which the parties disagreed. Ex. 22. Obviously this figure was well within First American's liability assessment, and again, this approach would have allowed the larger project to proceed and shielded First American from bad faith while still allowing it to fully litigate the issues of covered damages.

On March 1, 2012, after First American had failed to respond to this offer, Columbia Harbison again wrote to First American:

> Columbia Harbison on Monday of this week offered yet another proposal pursuant to which Columbia Harbison agreed to advance up to 85% of a settlement. All Columbia Harbison asked in return was for First American to contribute $250,000 that it has already offered and for First American to agree that Columbia Harbison could litigate its entitlement to additional damages under the title insurance policy. The purpose of this demand was to contain the exposure in the current litigation (that is literally getting worse by the day) and to allow the project to go forward in a way that causes the least amount of monetary loss. First American will not even respond to that offer by its insured.

> Instead of taking steps to protect its insured, First American is litigating this case to no meaningful end, and is in the process increasing the damages to its insured and increasing the likelihood that the project fails completely. While the policy grants First American the right to litigate the underlying action, it does not grant First American the right to do so in a way that unreasonably exposes its insured to a risk of loss, and it certainly does not allow First American to take this unprincipled course of action without giving any definitive guidance to its insured as to what First American believes is covered by its policy.

> The result of First American's insistence on litigation, when combined with policy prohibitions against settling without consent and First American's refusal to give definitive guidance on coverage, is that the insured has no ability to assess its exposure and no ability to protect its interests in the litigation while preserving its right to title insurance coverage. Instead of protecting its insured's

interests, First American's conduct is designed to produce the exact opposite result by making its insured desperate enough to settle the case in a way that relieves First American of its contractual responsibility.

Ex. 23. First American did not respond.

With no response from First American and trial in the underlying action fast approaching, Columbia Harbison again wrote to First American on March 8, 2012, requesting that First American either participate in settlement or make its coverage position clear on what items of loss First American felt were covered and uncovered:

> We are at the point where it is imperative that we have a response from First American. I spent the better part of yesterday afternoon meeting and talking with Duvall Spruill. At 6:00, I received a demand of $2.14M + fees to settle all claims in the lawsuit. With fees the demand at closer to $2.225M. It is not their bottom number, but I sense it is closer than we may have previously thought. In order to get that demand, I had to make an offer of $850K. I was comfortable with the risk involved with advancing that offer because I knew plaintiff would never accept it. Advancing the offer did, however, have the desired result of getting plaintiff to move, and the only way to find out the bottom number is to engage in negotiations.
>
> * * * * *
>
> I need one of two things today:
>
> (1) First American to engage and bring this matter to a resolution; or
>
> (2) First American to either disclaim coverage or tell its insured specifically what items of loss it believes are covered and what items it believes are not covered, and why. First American cannot continue to force its insured to guess at these things while it litigates the project into financial ruin, and it cannot use items that it privately believes are covered as bargaining chips in its discussions with its insured. If there are items First American has internally conceded are covered by its policy, those items need to be acknowledged and put aside while we discuss the remaining items. Any other approach is indefensible.

Ex. 19. First American provided no substantive response to this request, but instead stated only that the request was premature. Ex. 24. First American also reminded Columbia Harbison that First American would have no liability until all appeals were exhausted. *Id.*

First American's internal claims documents reveal that the reason First American did not

respond to the $250,000 proposal, or to the insured's letters of March 1 and March 8, 2012, was

that First American's claims supervisor wanted to use discovery in the state court action to gain

information that might support a denial:

> Obviously, that was rejected, particularly in light of the fact that Susan Stewart's deposition is still to be taken and may very well result in testimony which will support denial of coverage due to knowledge/created I suffered . . . coverage defenses. Immediately below is John Reeves' memo to you last week, and below that is the most recent email "demand" from the insured received today. It appears they (insured and plaintiff) are still negotiating and are somewhere between $850K and $2.25 million. The insured is demanding our participation and coverage decision TODAY.

> I am seeking direction as to: . . . Whether we want to engage in any settlement at all with the key deposition still pending.

Ex. 25.

Susan's Stewart's deposition was in no way a "key deposition" in the scheme of

defending Columbia Harbison in the state court litigation, and nothing about insisting the case

continue until Susan Stewart's deposition took place was intended to further the insured's

interests in that case. On the contrary, it was another instance in which claims supervisor Conrad

felt she could use Susan Stewart to hurt the insured. On February 10, 2012, while the mediation

was still in progress, Conrad was developing strategies to use Stewart to impeach Wesley

Graybill, who was also due to be deposed in the state court action:

> I agree we need to talk to Susan, preferably under oath, but not via deposition. I am leaning toward using her as a rebuttal witness and having our retained counsel elicit testimony as to the knowledge provided to induce issuance of the endorsement. If different from Susan's understanding, impeach. If agent knew and he failed to tell Susan, let's pursue agent. As always, the question will be "what did she know and when did she know it?"

Ex. 26. In a follow up email on February 10, 2012, Conrad expressed excitement that the trial

had been continued until March 26, 2012, to permit time for additional discovery on claims

issues: "Looks like some additional discovery is in order prior to trial, even if informal. Thank goodness it was continued until March 26!" Ex. 27. Viewing this evidence in the light most favorable to Columbia Harbison, a finder of fact could easily conclude that Conrad was affirmatively using the underlying state court action as a tool to develop evidence to avoid coverage as opposed to protecting its insured against financial liability.

In its motion, First American focuses exclusively on B&L Harbison's demand of $2.14 million plus fees, and states that "the reasonableness of First American's settlement efforts in the state court action" must be evaluated against that demand.[10] Plaintiff Memo at p. 20. First and foremost, First American did not engage in *any* settlement efforts after February 10, 2012. First American did not respond to any settlement options presented by its insured, and it did not engage in discussions directly with B&L Harbison. For First American to describe its total failure to act from February 10, 2012 until March 19, 2012 as "settlement efforts" is beyond the pale of argument.[11]

First American also tells only part of the story in its argument as to this demand of $2.14 million plus fees in order to buy back the easement rights. While First American asserts that "even Columbia Harbison acknowledges that these demands were unreasonable," First American fails to tell the Court that Columbia Harbison nonetheless asked First American to settle for that

---

[10] First American's motion overlooks, or simply ignores, that the first several rounds of requests from its insured after the mediation were for First American to participate in settlement. First American's claims file, however, recognizes this fact and First American's refusal to do engage because it wanted to use the underlying case to get additional information for its coverage action: "I am being peppered with demands from the insured to pitch in to settle this since the plaintiff is in town for depositions this week and the tenants' March 1, 2012 'deadline' is almost up. Is the consensus to sit tight until Susan's deposition a week from tomorrow?" Ex. 28.

[11] Not only did First American fail to engage in any settlement efforts, it ceased communicating with Columbia Harbison altogether. Columbia Harbison sent First American three separate email requests on March 12, 13, and 15, 2012. Ex. 16. First American did not respond to any of these requests.

amount or any amount it could negotiate because it would be less than Columbia Harbison's

insured losses if the injunction became permanent:

> Q. Mr. Wilson, I want to ask you a question about the settlement demand from Mr. Frankel, the last sort of cash demand, the 2.14 million plus his attorney's fees that would let the project go forward. Do you recall that discussion?
>
> A. I do.
>
> Q. There was a discussion that First American felt that was too much money. Do you recall that?
>
> A. I do.
>
> Q. And that Columbia Harbison thought that was too much money based on Paul Frankel's damages?
>
> A. Yes.
>
> Q. However, that figure was less than the losses that Columbia Harbison would sustain if the injunction became permanent, is that correct?
>
> A. That's correct.
>
> Q. Is that the reason Columbia Harbison felt First American should settle with Frankel even by overpaying compared to his damages?
>
> MR. KOUTRAKOS: Object to the form.
>
> A. Yes.
>
> Q. Financially it was the most pragmatic thing to do to allow the project to go forward?
>
> MR. KOUTRAKOS: Object to the form.
>
> A. Yes.

Ex. 13, p. 225, l. 4 – p. 226, l. 3.

Not only was this demand relayed to First American with the specific instruction that "it

is not their bottom number . . . and the only way to find out the bottom number is to engage in

negotiations," it was accompanied by the specific rationale for why First American should pay it: "[w]hile I believe plaintiff will move, I also believe plaintiff's current demand is within any reasonable view of coverage in the event of a final injunction." Ex. 19. Since First American had the option of settling with B&L Harbison or paying Columbia Harbison's losses, the reasonable finder of fact could easily conclude that even a generous payment to B&L Harbison that was less than Columbia Harbison's insured losses would be the reasonable thing to do.

Construed in the light most favorable to Columbia Harbison, there is ample evidence from which a finder of fact could conclude that First American's self-described "settlement efforts" were unreasonable in light of its outright refusal to engage in settlement after February 10, 2012 while concurrently using the state court action as a fishing expedition to support its desire to deny coverage.

### 3. First American's arguments with respect to the *Tyger River* doctrine ignore the actual rationale in *Tyger River*.

Instead of quoting from the seminal South Carolina decision of *Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.E. 346 (S.C. 1933), First American takes the novel approach of describing what it considers to be the "typical *Tyger River* case" of an excess judgment, and declaring there can be no actionable claim because there is no excess judgment. First American's argument is not supported by the legal analysis of *Tyger River*.

In its opinion, the South Carolina Supreme Court rejected the line of cases that permitted an insurer such as First American to act in its own self-interest in determining whether and on what terms to settle:

> The Kentucky court says: "At the outset it must not be overlooked that the insurance company is something more than the mere agent of the insured. Under the contract it occupies a twofold relation, one as insurer and the other as agent of the insured, *and may took to its own interests as well as those of the insured*, and what would be considered a compromise from the standpoint of the insured might

not be a compromise from the standpoint of the insurance company." (Italics added.)

We especially dissent from the language of the opinion which we have italicized. The very thing which the appellant in the case which we have before us for determination undertook to do was to hold the respondent harmless in the disposition of Chesser's claim. If, in the effort to do this, its own interests conflicted with those of respondent, it was bound, under its contract of indemnity, and in good faith, to sacrifice its interests in favor of those of the respondent. If the Kentucky rule is the law, then a policy of indemnity such as is before us becomes a delusion and a snare. In the nature of things when there is a conflict of interests -as is inevitably the case in all such matters-the company will give the preference to its own.

For the protection of its interests the casualty company especially reserved the right to control and direct the matter of negotiations for settlement and compromise, and of the defense of the action if litigation ensued. The plaintiff was directly deprived of a voice or part in such negotiations and defense. If the rule of the Kentucky case shall prevail, the indemnity companies may well felicitate themselves, for they are in position to say to the insured, "Heads I win, tails you lose."

*Id.,* 170 S.E. at 348.

While the particular facts of *Tyger River* involve uninsured damages by virtue of the $5,000 policy limit, nothing in the rationale of *Tyger River* limits the nature of the insured's otherwise unrecoverable losses to damages in excess of a policy limit. Instead, the focus of *Tyger River's* holding is on the insurer's obligation to hold the insured harmless from personal exposure, which includes the obligation to settle for an amount within its coverage provisions if that is the reasonable thing to do. *Id.* at 349. Here, it will be for the finder of fact to determine at whether First American could have settled in a way that would have prevented the very damages about which it now complains, and whether that would have been the reasonable thing to do in light of the coverage afforded by the endorsement.

Important in this regard, and missing from First American's analysis, is the *Tyger River* court's admonition that these factual determinations are to be made at trial by the finder of fact:

Defendant earnestly contends that there is no proof of negligence on its part in and about the negotiations for compromise and settlement and the defense of the action. We think there was proof sufficient to take the case to the jury, to be found in the letters pertaining to the various offers and counter-offers of settlement and in the testimony of T. S. Adams. The force of that evidence was solely a question for the jury.

*Id.* at 348. In the present case, as in *Tyger River*, it will be for the finder of fact to determine whether First American was unreasonable in its failure to resolve the case within the range of covered losses, and in that vein, whether First American's narrow assessment of covered losses was itself reasonable. These are not determinations suitable for summary disposition on an incomplete record.

## IV. CONCLUSION

First American's motion for summary judgment on bad faith is legally insufficient and based on facts which are either incomplete or otherwise disputed such that they are for the finder of fact to determine at trial. With respect to the latter, the ultimate flaw with First American's motion is that First American is not the arbiter of its own reasonableness. On the contrary, the determination of the reasonableness of First American's conduct is within the province of the finder of fact at a trial where the totality of the circumstances surrounding its claims conduct can be evaluated. As such, First American's motion for summary judgment should be denied, and this matter should proceed for a trial on damages and bad faith as already ordered by the Court in its order entered April 11, 2013.

s/ Kevin K. Bell
_____

Kevin K. Bell [5854]
ROBINSON, MCFADDEN & MOORE, P.C.
Post Office Box 944
Columbia, SC 29202
(803) 779-8900

Counsel for Columbia Harbison, LLC